IMOGENE BOSAK, Plaintiff-Appellant, v. THOMAS McDONOUGH, Defendant-Appellee (Gerald E. Murphy *et al.*, d/b/a Century 21 Realtors, Defendants).

First District (2nd Division) No. 1—88—3074

Opinion filed December 19, 1989.

John W. Long, of Chicago, for appellant.

Horvath & Wigoda, of Chicago (John F. Horvath and Paul E. Kantwill, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff-appellant Imogene Bosak sued defendant-appellee Thomas McDonough and defendants Gerald E. Murphy and John C. Kmiecik, alleging fraud and conspiracy to defraud against all defendants and breach of fiduciary duty against McDonough, in connection with four loans totalling $240,000 made to Murphy to cover shortages in Murphy's real estate escrow account. Bosak now appeals from the trial court's order granting McDonough's motion for summary judgment, raising as issues (1) whether the trial court erred in granting summary judgment in favor of McDonough on Bosak's conspiracy to defraud count; (2) whether the trial court erred in granting summary judgment in favor of McDonough on Bosak's breach of fiduciary duty count; and (3) whether Bosak is estopped to assert fraud against defendants because she participated in wrongdoing by loaning Murphy money knowing that it would be used for illegal purposes.

Bosak, a widow who received large sums of money upon her husband's death, met Murphy in a bowling alley in November 1979. Beginning in December 1979, Murphy, a real estate broker and owner of Gerald E. Murphy & Associates, Ltd. (GEMA), illegally commingled the funds in his real estate escrow account with the funds in his general business account. In March 1980, Murphy needed money to cover shortages in the escrow account. After being refused loans from several banks, he approached Bosak, explained to her the purpose of an escrow account, and told her that if he did not cover the shortage, he would lose his real estate license. Bosak gave Murphy $80,000 in exchange for a promissory note at 16% interest and a stock certificate for all outstanding shares in GEMA. Murphy deposited the money in his escrow account and told Bosak that because she had 100% of the stock, she had become the owner of the company.

In the summer of 1980, Murphy told Bosak he needed more money for the escrow account and Bosak loaned him an additional

$55,000, which she had obtained through a loan from a bank. Bosak later testified at her deposition that she loaned Murphy the money to "save his license and protect her prior investment." She did not receive any collateral for the $55,000 loan.

After receiving the second loan from Bosak, Murphy contacted McDonough and told him he was $100,000 short in his escrow account. McDonough told Murphy that the shortage in the escrow account was illegal, and advised him to contact Bosak to "create some money." Bosak then met with Murphy and McDonough. McDonough explained to Bosak that if the shortage was not covered, Murphy would lose his license and she would lose the money she had already invested. McDonough then prepared a loan application for Bosak, which Bosak reviewed and signed. McDonough drove Bosak to the bank, telling her again that if Murphy did not get money into his escrow account, "people would know there [was] trouble" and she would lose "everything that [she had] in there." Bosak obtained $40,000 from the bank and loaned it to Murphy.

Two weeks later, Murphy again told Bosak that the escrow fund was short and Bosak loaned Murphy yet another $50,000. This money was also obtained through a bank. Bosak filled out the application herself, but McDonough prepared the necessary documents to place the deed to Bosak's home in a land trust as collateral. Bosak asserts that McDonough received $2,500 from the proceeds of the loans as fees for the loan transactions, but McDonough maintains that he received only money that Murphy already owed him. Bosak testified later at her deposition that she would not have made the loans to Murphy had she known the seriousness of the troubled condition of the business.

In early 1981, Murphy's escrow account was still short and Murphy, concerned that State authorities would soon audit his escrow account, asked Kmiecik if he would consider buying GEMA. Revocation of Murphy's corporate, branch office, and broker's licenses became imminent, and Murphy told McDonough that a buyer had to be found and that he had spoken with Kmiecik in that regard. McDonough informed Murphy of a possible buyer other than Kmiecik and also advised Murphy that bankruptcy was an alternative. Nevertheless, Murphy met with Kmiecik and agreed that Kmiecik would purchase GEMA for the amount of the deficient escrow account plus the total outstanding obligation to Bosak. These discussions all occurred without Bosak's knowledge.

On March 15, 1981, State authorities discovered the illegal shortage in the escrow account. Murphy and McDonough traveled to

Springfield, where it was agreed that Murphy would surrender his broker's license, but the corporate and branch office licenses would remain intact until the sale of the business was completed.

Bosak, meanwhile, learned of the meeting with Kmiecik and requested that she be permitted to attend subsequent meetings involving the business. At the first meeting she attended, she was asked if it "would be agreeable to her for Kmiecik to run [GEMA]." Bosak indicated that such an arrangement would be agreeable. Although it is not clear whether Bosak agreed that Kmiecik would repay her loans, that topic was discussed at the meeting.

At the second meeting Bosak attended, she asked the lawyers present if she should have her own lawyer. Both McDonough and Kmiecik's lawyer told Bosak that she should have her own lawyer, whereupon Bosak stated she would consult with a lawyer named Tony Sisliano, with whom she was acquainted. McDonough responded that "he might blow the whistle on the whole deal" if he learned about the deficient escrow account, and referred Bosak to a lawyer named Hammer, with whom he was acquainted. Eventually, the subject of the money owed to Bosak was discussed. According to Bosak, she agreed to an arrangement under which Kmiecik would take over GEMA, but only under the condition that Kmiecik paid her $165,000 of the $250,000 owed by Murphy.

At the third meeting Bosak attended, she was represented by a lawyer named Axelrod, an associate of Hammer's. The parties discussed the sale of the business to Kmiecik. At the fourth meeting attended by Bosak, she was represented by Hammer. At that meeting, the parties agreed that as part of the sale of the business, Kmiecik would pay Bosak the money she was owed. McDonough, Hammer, and Kmiecik's lawyer told Bosak to "forget about" the GEMA stock she owned; that Murphy was going to lose his corporate and broker's licenses; and that Kmiecik would run the business. They also told her that only a licensed real estate broker could have an ownership interest in the agency. Bosak was not a licensed broker, but apparently had twice applied for a license without success.

A fifth meeting was held, at which Bosak was represented by a lawyer named Shields, whom Bosak had retained and who was not associated with either Hammer or Axelrod. At that meeting, Kmiecik again agreed to pay Bosak the money she had lent to Murphy.

On May 11, 1981, without Bosak's knowledge or express consent, McDonough, Murphy, and Kmiecik met and agreed to transfer all of GEMA's salespersons and real estate licenses to Kmiecik. Before the sale of the business could be completed, however, Murphy's corporate

and broker's licenses were suspended by the State authorities. Murphy and Kmiecik went to Springfield, where State officials reissued the corporate and broker's licenses under Kmiecik's name. Kmiecik then took possession of the offices, fixtures, and accounts of GEMA, and had all listing contracts changed to his company. Kmiecik made one interest payment on one of Bosak's bank loans, but then "decided not to pay anything."

In November 1982, Bosak filed a four-count complaint against Murphy, McDonough, and Kmiecik, alleging fraud and conspiracy to defraud against all three individuals, and breach of fiduciary duty against McDonough. In November 1986, McDonough moved for summary judgment. His motion was first granted on count II, the conspiracy to defraud count, and denied on count IV, the breach of fiduciary duty count. After further discovery, the motion was also granted on count IV. Murphy has not moved for summary judgment, and Kmiecik's motion for summary judgment was denied. This appeal concerns only issues raised by the dismissal of the counts directed against McDonough.

I

Bosak maintained first that summary judgment on the conspiracy to defraud count was improperly granted. She argues that McDonough's participation in a conspiracy to defraud may be inferred from the circumstances, especially McDonough's "strong role in guiding the actions of Murphy and Kmiecik" and that McDonough, who was fully aware of Murphy's fraudulent acts, is not shielded from liability by his membership in the legal profession. Bosak also argues that summary judgment was improvidently granted because there were disputed issues of fact as to whether McDonough induced her to make loans to Murphy knowing that Murphy's real estate business was worthless. We disagree.

▪▪▪ The elements of a cause of action for conspiracy to defraud are: (1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud. (*Abell v. First National Bank* (1987), 153 Ill. App. 3d 946, 948, 506 N.E.2d 684; *Commercial Products Corp. v. Briegel* (1968), 101 Ill. App. 2d 156, 164, 242 N.E.2d 317.) A "conspiracy" is a combination of two or more persons to accomplish the concerted action an unlawful purpose or a lawful purpose by unlawful means. (*Abell v. First National Bank*, 153 Ill. App. 3d at 948, 506 N.E.2d 684; *Celano v. Frederick* (1964), 54 Ill. App. 2d 393, 400 n.3, 203 N.E.2d 774.) Because a conspiracy is difficult to prove with direct evidence, it may be

established with circumstantial evidence and legitimate inferences therefrom. (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99, 160 N.E.2d 783.) Proof of civil conspiracy, however, if made solely by circumstantial evidence, must be clear and convincing. (*Tribune Co. v. Thompson* (1930), 342 Ill. 503, 529, 174 N.E.2d 561; *Abell v. First National Bank*, 153 Ill. App. 3d at 948, 506 N.E.2d 684.) If a conspiracy is shown, an injured plaintiff need only establish that an overt fraudulent act in furtherance of the conspiracy was committed by one of the alleged conspirators. See *Wolf v. Liberis* (1987), 153 Ill. App. 3d 488, 505 N.E.2d 1202.

■ In this case, summary judgment in favor of McDonough was properly granted because the facts, read in the light most favorable to Bosak, do not establish that McDonough participated in a conspiracy. There is no evidence that McDonough counseled Murphy to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means. On the contrary, the undisputed evidence shows that McDonough did not counsel Murphy with the object of defrauding Bosak, or agree in any way to perpetrate a fraud against Bosak, but merely advised Murphy to cover the unlawful shortage in his escrow account. McDonough told Bosak, correctly, that Murphy stood to lose his real estate licenses and, consequently, his business, if the shortage in the escrow account was not covered. Bosak agreed to make two additional loans to Murphy, fully aware that if the deficiency in Murphy's escrow account persisted, the business would fail and she would lose her prior investment. Bosak's bald assertion that she would not have loaned Murphy any money had she known the seriousness of Murphy's troubles, and that McDonough concealed knowledge that the business was worthless, is not supported by the record and does not raise a genuine issue of fact precluding summary judgment.

Although McDonough might have been ethically obligated to disclose that he was laboring under potential conflict of interest in assisting Bosak with a loan application form and with documents transferring the deed to her home into a land trust account, there is no evidence that McDonough's purpose in assisting Bosak in obtaining bank loans was fraudulent. There is evidence to the contrary that McDonough assumed the money was to be deposited into Murphy's escrow account, pursuant to the wishes of both Murphy and Bosak, received only legal fees for services performed on Murphy's behalf, and did not otherwise benefit from the loan transactions.

There is also no evidence that McDonough had a fraudulent purpose in facilitating the sale of the business. Indeed, when Murphy was still unable to cover the deficiencies in his escrow account and in-

formed McDonough that he wished to sell the business, McDonough told Murphy that bankruptcy was a possibility, or if that did not appeal to Murphy, that he knew of a potential buyer. Murphy stated that he already had a buyer in mind, whereupon discussions ensued between McDonough, Murphy, and Kmiecik. McDonough acted only as Murphy's lawyer in negotiating for the sale of the business. There is no evidence that McDonough intended to exclude Bosak from any meeting and, indeed, Bosak attended the meetings after she learned about them without any objection from McDonough. Although McDonough was reluctant to deal with a certain lawyer acquainted with Bosak, he in fact advised her to obtain a lawyer in the first instance and did not object when a lawyer retained by Bosak with whom he was not acquainted attended the meetings. Finally, the record shows that McDonough, like Bosak, understood that the business was to be sold to Kmiecik for a price which included either a lump sum payment to Bosak, or Kmiecik's assumption of Murphy's debt to Bosak. McDonough even offered to assist Kmiecik in obtaining the needed funds to complete the sale, which presumably would have benefitted Bosak, if only Kmiecik had paid her as promised.

Because there is no evidence that McDonough participated in a conspiracy, we need not decide whether evidence of an overt fraudulent act in furtherance of the conspiracy exists precluding summary judgment in favor of McDonough.

## II

Bosak maintains next that the trial court erred in granting summary judgment in favor of McDonough on her breach of fiduciary duty count. Bosak argues that she placed her trust and confidence in McDonough, creating a fiduciary relationship, and that McDonough breached his fiduciary duty by persuading her to make loans to Murphy knowing that the value of Murphy's business was worthless. We disagree.

■ A fiduciary relationship exists where one person places trust and confidence in another who thereby acquires dominance and influence over that person. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 367 N.E.2d 678.) A fiduciary relationship may arise incident to a legal, social, domestic, or personal relationship. (*Wolinsky v. Kadison* (1983), 114 Ill. App. 3d 527, 449 N.E.2d 151.) The existence of a fiduciary relationship must be shown by clear and convincing proof leading unequivocally and unmistakably to the conclusion that a fiduciary relationship existed. *Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 392 N.E.2d 759.

■ In this case, summary judgment in favor of McDonough was properly granted because the undisputed facts, and the disputed facts read in the light most favorable to Bosak, do not provide clear and convincing evidence of the existence of a fiduciary relationship. On the contrary, even if Bosak placed her trust in McDonough, the evidence shows that she was predisposed to loan money to Murphy. It is undisputed that McDonough had no involvement whatsoever in the first two loans. With respect to the third and fourth loans, McDonough merely informed Bosak that the money was needed to prevent Murphy from losing his real estate licenses, without which he would lose his business and Bosak would lose her investment. This fact was already known to Bosak, who admitted that she loaned Murphy additional money to protect her investment. It cannot be said that McDonough persuaded Bosak to make the loans by assisting her with her loan application, or by preparing the necessary documents to put her house up as collateral. By that time, Bosak had already decided to make the loans. She provided McDonough with the necessary information and reviewed the documents he prepared. All the evidence shows that Bosak acted independently and was neither dominated nor influenced by McDonough's actions. Certainly, clear and convincing proof of the existence of a fiduciary relationship is lacking, and summary judgment in favor of McDonough was properly granted.

Because of our conclusions above, we do not reach the other issues raised by McDonough.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BILANDIC, P.J., and SCARIANO, J., concur.