790 So.2d 862 (2001)
DELTA CHEMICAL AND PETROLEUM, INC., and Elaine Chemical, Inc., Appellants,
v.
CITIZENS BANK OF BYHALIA, MISISSIPPI, William T. Dawson and Joyce M. Dawson, Jointly and Severally, Appellees.
No. 1998-CA-010135-COA.
Court of Appeals of Mississippi.
March 27, 2001.
Certiorari Denied July 19, 2001.
*864 Barrett Jerome Clisby, Oxford, Andrew T. Dulaney, Tunica, Attorneys for Appellants.
S. Duke Goza, Robert K. Upchurch, Tupelo, Dion Jeffery Shanley, Ridgeland, David W. Upchurch, Tupelo, Attorneys for Appellees.
EN BANC.

ON MOTION FOR REHEARING
THOMAS, J., for the Court:
¶ 1. The Motion for Rehearing is denied, and the opinion will be withdrawn and this opinion substituted. Delta Chemical and Petroleum, Inc. and Elaine Chemical, Inc. appeal the judgment of the Circuit Court of Marshall County raising the following assignment as error:

I. WHETHER THE CIRCUIT COURT ERRONEOUSLY GRANTED THE APPELLEES MOTION FOR DIRECTED VERDICT.
¶ 2. Finding error, we reverse and remand in part and affirm in part.
¶ 3. This case involves the apparent misuse of trust by a corporate president, Richard Sands, who was also a partial owner of the two Appellant corporations, Delta Chemical and Petroleum, Inc., and Elaine Chemical, Inc. Sands, through the misappropriation and fraudulent endorsement of several chemical rebate checks made payable to the respective corporations, diverted said assets totaling approximately $800,000 into similarly named non-corporate sole proprietor accounts, Delta Chemical and Petroleum (Not Inc.) and Elaine Chemical (Not Inc.). The two accounts were opened by Sands and maintained at the Citizens Bank of Byhalia, Mississippi. In their complaint, Delta, Inc. and Elaine, Inc. assert three theories of liability against Citizens Bank of Byhalia, William T. Dawson and his wife, Joyce Dawson. William Dawson was an executive vice-president, president and a member of the board of directors for Citizens Bank at the time the activity took place. *865 Joyce Dawson was an employee of Sands and his bookkeeper for his various other companies.
¶ 4. Delta, Inc. and Elaine, Inc. first allege that Citizens Bank and William Dawson are, jointly and severally, negligent in failing to exercise ordinary or reasonable care with regard to the deposit of checks belonging to both Delta, Inc. and Elaine, Inc. into "sham" accounts of different but similar names at Citizens Bank. In their second theory of liability, Delta, Inc. and Elaine, Inc. allege that Citizens Bank, William Dawson, and Joyce Dawson, jointly and severally, did convert funds belonging to Delta, Inc. and Elaine, Inc. in absence of good faith or reasonable business standards, by allowing deposit and collecting on said checks based on the improper endorsements. The third theory of liability alleges that Citizens Bank, through its employees and officers, together with William Dawson and Joyce Dawson, jointly and severally, intentionally, maliciously, wilfully, and wantonly, by both material false representation and fraudulent concealment entered into a conspiracy with Sands to defraud Delta, Inc. and Elaine, Inc., respectively.
¶ 5. The trial court entertained a motion for a directed verdict made at the close of the plaintiff's case and granted said motion. Without any detailed findings or any elaboration as to the trial court's conclusion, the trial court simply concluded that having had an opportunity to hear the testimony and view the exhibits, that the plaintiffs, Delta, Inc. and Elaine, Inc., case should fail as a matter of law. Under what basis the trial court made this conclusion, we do not know.

FACTS
¶ 6. In February of 1990, Richard Sands and William T. Latimer, III entered into a partnership. Together, they formed Delta Chemical and Petroleum, Inc. in an effort to increase their own respective operations both regionally and financially. The newly formed partnership was actually incorporated in the State of Mississippi on January 8, 1990. Both men had been in the agricultural chemical and supply business for a great number of years. Latimer had been in the farm and chemical supply business since the late 1960's and was designated vice-president of Delta, Inc. Sands had also been in the farm and chemical supply business for a number of years and was designated president and chief executive officer of Delta, Inc. Ownership of the newly created corporation was vested between the two men and their respective businesses. Chickasaw Chemical, in which Latimer was also a part owner, obtained part-ownership in Delta, Inc. while Sands owned the remaining interest. Sands also owned and operated, among other businesses, two chemical supply businesses known as D & H Chemical and Delta Chemical & Supply. At the creation of Delta, Inc., the assets of Delta Chemical & Supply were sold, its debts assumed by Delta, Inc. and the two merged.
¶ 7. In 1992, Latimer also became a partner and part owner in Elaine, Inc., an Arkansas corporation located in Elaine, Arkansas, with Sands as a partner and part owner as well. Elaine, Inc. was also in the farm and chemical supply business servicing portions of Arkansas. Elaine, Inc. has ceased to exist and is no longer a corporate entity within Arkansas.
¶ 8. Delta, Inc. and Elaine, Inc. both operated as suppliers to area farmers, which partly entailed selling chemicals, fertilizer, seed, and other farm supplies. Sometimes, the two corporations would, in turn, purchase crops produced by the various farmers. The methods of payment were generally made in cash upon purchase or net thirty, and in some cases *866 credit was extended through the fall, at which time the crops were harvested and accounts would then be settled. As a large supplier of farming chemicals, Delta, Inc. and Elaine, Inc. participated in various rebate programs with the chemical manufacturers to encourage sales of their products. The rebate program operates much like an incentive program and is common in the industry. Several chemical manufactures including DuPont, Ciba, Geigy, Baylant, Griffin, Mobay, and FNC offered such programs. The rebate program rewards the suppliers, Delta, Inc. and Elaine, Inc., with rebates based on the quantity of the manufacturer's chemicals that have been sold during the previous months. Supplies of chemicals are ordered from the manufactures and stored in the supplier's warehouse until such time as they are needed by the farmers. Payments for the chemicals were received from the farmers in one of the three previously listed methods and the proceeds are then forwarded to the respective manufactures as payments on the chemicals. Rebate checks were usually remitted between October and February.
¶ 9. Everything appeared to run smoothly at the two corporations until 1992, when DuPont Chemical notified Latimer that they suspected that false invoices were being manufactured at Delta, Inc. in order to get additional rebates. Latimer began an investigation into the allegations and discovered that Sands was responsible. To prevent any additional problems, a computerized inventory system was installed at Delta, Inc. to monitor inventory and sales on a daily basis. Delta, Inc. reimbursed DuPont for the fraudulent invoices and rebates, but their business relationship remained soured. Elaine, Inc., however, did continue its business relationship with DuPont Chemical.
¶ 10. Additional problems, and the source of the current dispute now before this Court, surfaced during an annual audit required by First Systems Bank of Colorado. First Systems Bank had lent Sands and Latimer the necessary funds to create Delta, Inc. During this audit, it was discovered that Delta, Inc. had an abnormally high inventory. This discovery resulted in further investigations, in which Latimer learned that Sands had opened two sole proprietorship accounts with Citizens Bank of Byhalia under the names of Delta Chemical and Petroleum Company (Not Inc.) and Elaine Chemical Company (Not Inc.). Approximately $800,000 in rebate checks were diverted from Delta, Inc. and Elaine, Inc. by Sands through the fraudulent endorsements and subsequent depositing into the two similarly named account at Citizens.
¶ 11. As part of the agreement between Delta, Inc. and First Systems Bank, the only approved depositary bank for Delta, Inc. was Northwest Bank in Tunica, Mississippi. Per this agreement, Delta, Inc. argues that any deposits or banking activity with a bank other than Northwest Bank was prohibited. Delta, Inc. argues that Sands was aware of this and that he had neither implied nor express authority to open a separate account with an unauthorized bank, Citizens. Likewise, with respect to Elaine, Inc., Latimer testified that Elaine, Inc.'s only approved bank account was with First National Bank in Helena, Arkansas. Elaine, Inc. also asserts that Sands neither had implied nor expressed authority to open a separate account with Citizens. Latimer further maintains that Sands withheld the existence of the two fraudulent accounts opened at Citizens.
¶ 12. Delta, Inc. and Elaine, Inc. submit that Sands's fraudulent activities were further facilitated through assistance from two of his lifelong friends and mutual business *867 partners, William and Joyce Dawson. William Dawson was executive vice-president, president, and a member of the board of directors for Citizens Bank. Joyce is William's spouse and part-time bookkeeper for some of Sands's businesses. Sands had developed an extensive banking history with Citizens through the businesses he previously owned and some that he continued to operate: Delta Chemical and Supply, D & H Chemical, Byhalia Oil Company, and others.
¶ 13. In October and November of 1991, Sands went to Citizens Bank and opened the two accounts, Delta Chemical and Petroleum Company (Not Inc.) and Elaine Chemical Company (Not Inc.). No inquiry by Citizens Bank was made as to Sands's authority to open the two accounts as they were both opened as sole proprietorships and not as corporate accounts; therefore, no corporate resolutions were required. The signature card with instructions for mailing the monthly banking statements for Elaine Chemical Company was marked at William Dawson's direction "Do not mail, Give: Bill Dawson." The banking statements for Delta Chemical and Petroleum Company were also retained by William Dawson for personal delivery to Sands and never mailed. Two endorsement stamps were procured and maintained in William Dawson's desk drawer at Citizens Bank for the two accounts, which Sands, and sometimes William Dawson, would use to endorse the rebate checks made payable to either Delta, Inc. or Elaine, Inc. and then deposit them into the two similarly named accounts. Since Joyce Dawson also acted as Sands's bookkeeper with his other businesses, she would sometimes deliver rebate checks given to her by Sands to her husband William for deposit into the two accounts at Citizens. The rebate checks, payable to either Delta, Inc. or Elaine, Inc., were accepted upon presentment at Citizens Bank and deposited into the two "sham" accounts without any inquiry as to why the proper payee name and the endorsements did not match.
¶ 14. By virtue of these direct acts with respect to the actual handling, presentment, and acceptance of assets rightfully belonging to Delta, Inc. and Elaine, Inc., both corporations maintain that sufficient evidence was presented to support their claim of negligence against Citizens Bank and William Dawson for failing to exercise ordinary or reasonable care with regard to the deposit of checks belonging to them. Delta, Inc. and Elaine, Inc. further assert that the above stated facts support their second claim of conversion in the absence of good faith or reasonable business standards by allowing deposit and collecting on said rebate checks based on improper endorsements.
¶ 15. In addition to the aforementioned facts, Delta, Inc. and Elaine, Inc. submit that the Dawsons's involvement with Sands went far beyond a mere close friendship. At trial, testimony revealed that Joyce Dawson was Sands's bookkeeper for D & H Chemical and Byhalia Oil Company. Joyce Dawson received and balanced the bank statements for D & H Chemical and Byhalia Oil Company and was on the signature card for both companies as well. The Dawsons's children also worked for Sands, on occasion, helping with Byhalia Oil Company. Through these accounts, the Dawsons received benefit through the purchasing of various personal items and the making of some personal loans. These facts, in addition to the personal relationship between the two families, are asserted to be supportive of Delta, Inc.'s and Elaine, Inc.'s third theory of liability. It is alleged that Citizens Bank, through its employees and officers, together with William Dawson and Joyce Dawson, jointly and severally, intentionally, *868 maliciously, wilfully, and wantonly, by both material false representation and fraudulent concealment entered into a conspiracy with Sands to defraud Delta, Inc. and Elaine, Inc., respectively.
¶ 16. The complaint in this matter was filed on March 15, 1996 and set forth the three previously listed theories of liability against Citizens Bank, William Dawson, and Joyce Dawson. Citizens Bank answered on May 29, 1996, and Joyce Dawson and William Dawson filed separate answers and defenses on June 7, 1996. The case went to trial on April 6, 1998. On April 8, 1998, at the close of Delta, Inc.'s and Elaine, Inc.'s case, the trial court granted the defendants's motion for directed verdict with said order entered on April 15, 1998. Delta, Inc. and Elaine, Inc. filed a motion to reconsider and for a new trial on April 30, 1998. The defendant's joint response was filed on May 7, 1998; the court denied plaintiffs's motion to reconsider and for a new trial on May 12, 1998. Appeal was then taken with this Court.

STANDARD OF REVIEW
¶ 17. In reviewing a trial court's decision to grant a directed verdict, we review such decisions under the de novo standard of review. Long v. Harris, 744 So.2d 839 (¶ 8) (Miss.Ct.App.1999); Northern Elec. Co. v. Phillips, 660 So.2d 1278, 1281 (Miss.1995). The same standard is employed in evaluating motions for directed verdict as is employed in evaluating motions for judgment notwithstanding the verdict. American Fire Protection, Inc. v. Lewis, 653 So.2d 1387, 1390 (Miss.1995); Sperry-New Holland v. Prestage, 617 So.2d 248, 252 (Miss.1993). This Court considers the evidence in the light most favorable to the non-moving party when evaluating whether the granting of a directed verdict is proper, giving that party the benefit of all favorable inferences that may be drawn from the evidence. Little by Little v. Bell, 719 So.2d 757 (¶ 13) (Miss. 1998). We will conclude that the motion should not have been granted if, in reviewing all of the favorable inferences which benefit the non-moving party, we find that the quality and weight of the evidence could present differing conclusions among reasonable and fairminded jurors exercising impartial judgment. Sperry-New Holland, 617 So.2d at 252; Pace v. Financial Sec. Life of Mississippi, 608 So.2d 1135, 1138 (Miss.1992).

ANALYSIS

I.

WHETHER THE CIRCUIT COURT ERRONEOUSLY GRANTED THE APPELLEES MOTION FOR DIRECTED VERDICT.

A. Conversion under UCC § 3-419 and Negligence.
¶ 18. We quickly note that substantial interplay exists among differing legal areas of agency law and the relevant provisions of the Uniform Commercial Code, specifically the provisions touching banking liability as it pertains to endorsements and reasonable commercial standards. Each is pertinent in their own right to our resolution of this case. In determining whether the lower court erred in granting the motion for a directed verdict against Delta, Inc. and Elaine, Inc., we must first turn to the relevant portions of the Mississippi Uniform Commercial Code that were controlling during the period in which Sands's alleged fraudulent diversion of the assets of Delta, Inc. and Elaine, Inc. into the `sham' accounts with Citizens took place. The Uniform Commercial Code was completed in 1950 and has since undergone periodic amendments and revisions. The latest revisions pertaining to *869 the relevant sections applicable to our analysis in the case sub judice occurred in 1990, but were not effective in Mississippi until January 1, 1993. Therefore, any banking activity conducted prior to January 1, 1993 is governed under the former applicable UCC sections.
¶ 19. Under § 3-419 of the UCC, codified as § 75-3-419 Miss.Code Ann. (Rev. 1991), a proper payee is permitted to seek direct action on conversion against a depositary or collecting bank that accepts an instrument bearing a forged endorsement. Section 75-3-419 provides:
(1) An instrument is converted when
(a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or
(b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or
(c) it is paid on a forged indorsement.
(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.

(3) Subject to the provisions of this code concerning restrictive [e]ndorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.
(4) An intermediary bank or payor bank which is not a depositary bank is not liable in conversion solely by reason of the fact that proceeds of an item indorsed restrictively (Sections 3-205 and 3-206) [§§ 75-3-205 and 75-3-206] are not paid or applied consistently with the restrictive indorsement of an indorser other than its immediate transferor.
Miss.Code Ann. § 75-3-419 (Rev.1991) (emphasis added).
¶ 20. Mississippi has allowed the recovery by the proper payee from both the drawee bank and the collecting bank. Mississippi Bank & Trust Co. v. County Supplies & Diesel Serv., Inc., 253 So.2d 828, 830 (Miss.1971) (holding that payee of check endorsed by unauthorized endorsee had right of recovery against both drawee bank and collecting bank which obtained possession of check under unauthorized endorsement and collected amount of check from drawee); Hart v. Moore, 171 Miss. 838, 158 So. 490, 496 (1935) (holding that bank held liable to make good loss to maker of check, paid by bank to payee's agent on latter's forged endorsement of payee's signature; bank's failure to make investigation as to genuineness of endorsement being direct and proximate cause of loss). E.g. Commercial Nat. Bank & Trust Co. of Laurel v. Hughes, 243 Miss. 252, 137 So.2d 800 (1962); Masonic Benefit Ass'n v. First State Bank of Columbus, 99 Miss. 610, 55 So. 408 (1911).
¶ 21. The code further offers the following definitions with respect to "depositary bank" and "collecting bank." A "depositary bank" is "the first bank to which an item is transferred for collection even though it is also the payor bank;" while, a "collecting bank" is "any bank handling the item for collection except the payor bank." Miss.Code Ann. § 75-4-105(a), (c) (Rev.1991). The official comment to UCC § 3-419(1)(c) recognizes that as an addition *870 to the original version of the UCC: "It adopts the prevailing view of decisions holding that payment on a forged [e]ndorsement is not acceptance, but that even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion." UCC § 3-419(1)(c) cmt.
¶ 22. While the code does define "unauthorized" as a "signature or [e]ndorsement... made without actual, implied or apparent authority and includes a forgery," the code does not define what actions constitute a forgery. Miss.Code Ann. § 75-1-201(43) (Rev.1991). Forgery, however, has been defined as "a signature of a person [entity] that is made without the person's [entity's] consent and without the person [entity] otherwise authorizing it." BLACK'S LAW DICTIONARY 650 (6th ed.1990). Presently, there are no Mississippi cases which address the definition of "forgery" as it relates interchangeably with the UCC's definition of "unauthorized." However, in keeping with one of the expressed purposes of the UCC, that being the aim "to make uniform the law among the various jurisdictions," we will generally afford great difference to the decisions reached by our sister jurisdictions in deciding similar matters. Miss. Code Ann. § 75-1-102(2)(c) (Rev.1991). See Bay Springs Forest Prods., Inc. v. Wade, 435 So.2d 690, 695 (Miss.1983) (holding that as a legislative mandate to construe the UCC so as to "make uniform the law among the various jurisdiction," we give considerable weight to construction placed upon the code provisions by the highest courts of our sister states).
¶ 23. Many of our sister jurisdictions have addressed the term "forgery" as it applies to § 3-419's "unauthorized endorsement" and as it applies in a strict or literal sense of the term. They have held that "forgery" under § 3-419 includes "unauthorized signature," and have interpreted the UCC in a myriad of cases as allowing the terms "unauthorized" and "forgery" to operate interchangeably for purposes of determining bank liability under § 3-419. See Oswald Mach. & Equip., Inc. v. Yip, 10 Cal.App.4th 1238, 13 Cal.Rptr.2d 193, 196 (1992) (holding that as with a forgery, when a bank pays on an instrument via an unauthorized endorsement, that bank has exercised dominion and control over the instrument inconsistent with the rights of the true owner, thus resulting in the conversion of the instrument); Levy v. First Pennsylvania Bank N.A., 338 Pa.Super. 73, 487 A.2d 857, 860 (1985) (holding that for purposes of a conversion action under the UCC, an unauthorized signature is the same as a forgery); Confederate Welding & Safety Supply, Inc. v. Bank of the Mid-South, 458 So.2d 1370, 1373-74 (La. Ct.App.1984) (holding that a forged endorsement, within the meaning of UCC § 3-419, encompasses an unauthorized endorsement); Aetna Cas. and Surety Co. v. Hepler State Bank, 6 Kan.App.2d 543, 630 P.2d 721, 725 (1981) (holding that forged endorsement as pertains to conversion under relevant statute governing conversion of instruments does not preclude a finding of conversion where an unauthorized signature does not constitute forgery in strict sense); Equipment Distributors, Inc. v. Charter Oak Bank & Trust Co., 34 Conn.Supp. 606, 379 A.2d 682, 684 (1977) (holding that both an unauthorized and a forged endorsement of an instrument are one and the same, whether one construes the phrase under the more liberal framework of UCC or under the strict interpretation of the forgery statute); Salsman v. National Community Bank of Rutherford, 102 N.J.Super. 482, 246 A.2d 162, 167-68 (1968) (holding that applicable New Jersey statute provides that an unauthorized *871 signature or endorsement is one made without authority (actual, implied or apparent) and includes a forgery). See generally, Barbara Singer, Uniform Commercial Code Section 3-419 And The Battle To Preserve A Payee's Right To Sue Directly A Depositary Or Collecting Bank That Pays On A Forged Indorsement, 15 SETON HALL LEGIS. J. 39, 77-78 (1991). Further, comment 1 to § 3-404 provides that an unauthorized endorsement "includes both a forgery and a signature made by an agent exceeding his actual or apparent authority." Singer, supra, at 77-78, n. 192. Therefore, we, like many of our sister jurisdictions, agree that for purposes of a conversion suit there is little, if any, difference between "unauthorized" endorsements and forged endorsements.
¶ 24. This proposition was best said in Oswald: "There is no substantial difference between an unauthorized endorsement and a forged endorsement, the result being the same in so far as concerns the passing of title." Oswald, 13 Cal. Rptr.2d at 196 (citing Salsman, 246 A.2d at 167-68). In maintaining an action for conversion under both the common law and § 3-419 of the UCC, a proper payee, such as Delta, Inc. or Elaine, Inc., in choosing to sue in conversion must meet the initial burden of proof by showing: (1) title to, possession of or right to possession of a check, (2) the payee's forged, unauthorized or missing endorsement on the check, and (3) the depositary or collecting bank's unauthorized payment of the check. Singer, supra, at 70. We need not discuss further whether the evidence produced at trial supports a meeting of the first prong as this was clearly done and is not at dispute between the parties. However, it is with the second and third prongs that the parties take issue.
¶ 25. Nevertheless, before reaching the question of whether Citizens Bank is liable for accepting and honoring the checks in a manner that was negligent from a commercially unreasonable standpoint, it must first be settled whether the manner in which Sands endorsed and presented the checks exceeded his implied or actual authority as given by the corporation whether actual and expressed or implied and constructive.
¶ 26. We now turn to the law as it applies to an agent and his principal. As previously stated under § 1-201, "unauthorized" is defined as a "signature or [e]ndorsement... made without actual, implied or apparent authority and includes a forgery," the code does not define what actions constitutes a forgery. Miss.Code Ann. § 75-1-201(43). Equally so, the code does not define the above listed authority concepts, but does state that "the law related to ... principal and agent ... shall supplement its provisions." Miss.Code Ann. § 75-1-103.
¶ 27. A determination of Sands's capacity as an authorized agent of the two corporations to effectuate endorsements of the rebate checks belonging to Delta, Inc. and Elaine, Inc. is necessary. As previously stated, the development of Mississippi law in this particular area, as it specifically pertains to the facts of the case sub judice, is minuscule at best; there are no Mississippi cases directly, or even closely, on point. We are, however, persuaded with the analysis and decisions reached by our sister jurisdictions in concluding similar matters. One case in particular, Oswald, is strikingly similar with the particular facts in the case sub judice.
¶ 28. Oswald Machine & Equipment, Inc. was a small, closely held corporation, much like that of Delta, Inc. and Elaine, Inc. Oswald, 13 Cal.Rptr.2d at 194. Oswald was engaged in the business of selling, *872 servicing, and repairing of industrial and marine diesel and gas engines. On August 1, 1983, Oswald hired Jonathan Yip as their bookkeeper and clerical assistant. Yip was elected secretary/treasurer of the corporation within a few months of his hiring. Naturally, part of Yip's responsibilities included maintaining the company's account receivables. Yip was also authorized to endorse checks made payable to Oswald for deposit into Oswald's various commercial bank accounts. As part of these responsibilities, Yip was authorized to utilize certain deposit-endorsement stamps provided by Oswald's banks to make the deposits to the company's accounts. The evidence produced at trial revealed that within one week of his hire, Yip began siphoning and diverting company funds into "sham" banking accounts opened at various banks. This is not unlike the evidence produced at trial concerning the activities of Sands. Id.
¶ 29. On August 9, 1983, just eights days after he was hired, Yip opened his first "sham" account with The Hibernia Bank in the name of "Oswalds Machine Equipment Co." Id. at 194-95. Yip identified himself as the sole proprietor of the company. Three months later, Yip produced a forged "corporate resolution" purportedly authorizing the account. After procuring a deposit-endorsement stamp in the name of the fictitious company, Yip began endorsing checks made payable to the true Oswald Corporation, albeit in varying but similar variations of "Oswald Machine & Equipment, Inc., for the next 43 months until at such time he had diverted approximately $1 million." Id. at 195.
¶ 30. A second "sham" account, "Oswold Equipment," was opened by Yip in March of 1987 with the Bank of America. Yip basically followed the same procedure used in establishing the first "sham" account to establish the second. A deposit-endorsement stamp was procured and Yip signed the signature card as president of the company. Yip's continuing scam lasted another four months following this second account, until in July of 1987, Oswald discovered and alerted banking officials of the fraud. By this time, Yip had deposited approximately $51,000 into the Bank of America account and withdrawn all but around $5,000. Id.
¶ 31. It was later discovered that Yip had once served a six-month term in federal prison for bank larceny in 1977 and that same year had pleaded guilty to misdemeanor grand theft, conspiracy, and receiving stolen property. Oswald, Inc. brought suit against both Hibernia and Bank of America alleging conversion of those instruments under § 3-419 of the UCC. Both banks moved for summary judgment asserting that Oswald, Inc. had expressly authorized Yip to endorse company checks made payable to Oswald. At the trial level, the banks successfully argued that an authorized endorsement cannot be a "forgery" for purposes of conversion, and that therefore, no liability could be held against them for honoring the forged checks upon presentment. Summary judgment was granted with the trial court concluding that "no triable issue of material fact as to whether the endorsements stamped on the misappropriated checks were `forgeries' within the meaning of the code." However, the matter was reversed and remanded on appeal to the First District Court of Appeal, California. Id.
¶ 32. We note that while the Oswald case was decided by the California Appeals Court based on the specific arguments advanced and the conclusions reached at trial as to whether the "endorsements stamped on the misappropriated checks were `forgeries' within the meaning of the code," and that this specific question was not *873 argued in the case sub judice, we nevertheless find credence in their analysis as it applies to the matter now before us. Id.
¶ 33. The Oswald court concluded, just as we now do, that:
Although the code does not define forgery, it does provide that an unauthorized endorsement includes a forgery. Unauthorized signature or [e]ndorsement means one made without actual, implied or apparent authority and includes a forgery. Conversely, numerous other jurisdictions have determined the term "forgery" in their equivalent of [§ 3-419] applies to unauthorized endorsements, as well as to forgeries in the strict sense of the word.... As with a forgery, if a bank pays an instrument on an unauthorized endorsement, then it has exercised "dominion and control over the instrument inconsistent with the rights of the owner, and [resulting] in liability for conversion. Conversely, a signature that is authorized cannot be a forgery.
Id. at 196 (citations omitted).
¶ 34. Having said this, we turn to the evidence presented at trial and the grant of directed verdict. We are reminded that this review is undertaken in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that may be drawn from the evidence. Little by Little, 719 So.2d at (¶ 13). It necessarily turns that the evidence presented at trial must raise some question as to whether "differing conclusions among reasonable and fairminded jurors exercising impartial judgment," could be found as to what Sands's actual authority was with respect to the endorsements and deposits that were made to the two "sham" accounts. Sperry-New Holland, 617 So.2d at 252.
¶ 35. Following these standards and the testimony presented at trial, clearly Sands had the actual authority to operate the two businesses on a day-to-day basis which included accepting chemical rebate checks, or any other checks for that matter, for deposit. Equally so, however, we can only conclude that the evidence submitted at trial, at the very least, raises some reasonable question from which differing conclusions could be reached. The jury should have been left to decide whether Sands's actual or implied authority did or did not extend to opening fictitious accounts with non-approved banks including the subsequent endorsing of the said checks in the fictitious names for deposit into "sham" accounts. With respect to Sands's authority to endorse checks made payable to the incorporated companies, his authority, as supported at trial, was limited to restrictively endorsing the checks into the Incorporated accounts, and he was not necessarily authorized to endorse those checks as he did. We look to the testimony and evidence presented at trial for closure on this issue. Latimer testified that Sands's actual authority was limited with respect to accepting, endorsing, and depositing checks made payable to the two corporations. It is undisputed that Sands had the actual authority to accept and endorse checks payable to either Delta, Inc. or Elaine, Inc. for deposit into their respective authorized accounts at Northwest Bank in Tunica, Mississippi and First National Bank in Helena, Arkansas. The disputed question, therefore, is whether the "unauthorized" endorsements made by Sands in the name of the two fictitious companies and their subsequent deposit into the two `sham' accounts was in furtherance of his authority, whether actual, implied, or apparent to run the day-to-day operations of the two corporations. As stated in Oswald, the question, therefore, is whether Sands's actual authority to do the first embraced, as a matter of law, the *874 actual authority to do the second. See Oswald, 13 Cal.Rptr.2d at 197-98.
¶ 36. As previously stated, the UCC expressly provides that, "[u]nless displaced by the particular provisions of this code ... the law related to ... principal and agent ... shall supplement its provisions." Miss.Code Ann. § 75-1-103. Under agency principles, it has long been accepted that a principal may confer as much or as little authority to the agent as the principal sees fit. A determination of liability for conversion under the pertinent sections of the UCC is limited to the existence and scope of Sands's authority when the deposits were actually made, rather that any subsequent misconduct with respect to Sands's use of the funds. See In re Bartoni-Corsi Produce, Inc., 130 F.3d 857, 862-63 (9th Cir.1997) (holding that actual authority is such that of a principal intentionally conferring upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess).
¶ 37. Under general Mississippi law, an agent's authority may be either actual or apparent. Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1180 (Miss.1990). The issue of actual authority need not be reached if the agent had apparent authority. Baxter Porter & Sons Well Servicing Co., Inc. v. Venture Oil Corp., 488 So.2d 793, 796 (Miss.1986) (citing McPherson v. McLendon, 221 So.2d 75, 79 (1969)). "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent that the agent has the power he is assumed to have." Andrew Jackson, 566 So.2d at 1180 (citing Ford v. Lamar Life Ins. Co., 513 So.2d 880, 888 (Miss.1987)). Restated:
[T]he principal is bound if the conduct of the principle is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have. The agent's authority as to those with whom he deals is what it reasonably appears to be so far as third persons are concerned, the apparent powers of an agent are his real powers.
Andrew Jackson, 566 So.2d at 1180-81 (citing Steen v. Andrews, 223 Miss. 694, 697-98, 78 So.2d 881, 883 (1955) (quoting Gulf Guar. Life Ins. Co. v. Middleton, 361 So.2d 1377, 1383 (Miss.1978); McPherson, 221 So.2d at 78).
¶ 38. As was held in Oswald, an analysis under agency principles results in our concluding that "endorsements to improper accounts may be `unauthorized,' although the employee who signed the instruments was in fact authorized to endorse checks for deposit to the employer's account." Oswald, 13 Cal.Rptr.2d at 199. See also Confederate Welding, 458 So.2d at 1374-75 (holding that authority to endorse checks for deposit into corporate account did not encompass additional authority to endorse corporate checks for deposit into president's personal account.); In re Taco Ed's, Inc., 63 B.R. 913, 2 UCC Rep. Serv.2d 209, 221, 223-24 (Bankr. N.D.Ohio 1986) (holding that absent an authorization to deposit corporate checks into personal accounts in a corporate capacity, endorsements were forgeries); Grosberg v. Michigan Nat'l. Bank-Oakland, 420 Mich. 707, 362 N.W.2d 715, 719 (1984) (holding that while actual authority may exist to endorse and deposit corporate checks only into approved corporate banking accounts, that same authority did not extend to endorsements which were deposited into `sham' accounts); Trust Co. Bank of Augusta, N.A. v. Henderson, 185 *875 Ga.App. 367, 364 S.E.2d 289, 291 (1987) (holding that despite employee's authority to endorse and deposit checks into employer's account, a forgery exists when employee endorses checks and deposits them into personal account).
¶ 39. Having resolved the issue of Sands's authority as a matter for the jury to decide, the issue thus becomes whether Citizens applied "reasonable commercial standards" in accepting that Sands possessed the authority, which he held himself out as having, when he opened the two fictitious accounts and subsequently endorsed and presented the checks for deposit into the two "sham" accounts. We are reminded that in addressing whether Citizens acted with reasonable prudence, § 75-3-419(3) proscribes that:
Subject to the provisions of this code concerning restrictive [e]ndorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.
Miss.Code Ann. § 75-3-419(3) (emphasis added).
¶ 40. Section 75-3-419(3), with its "reasonable commercial standards" provision operates as an affirmative defense for the defendant bank to the conversion claims asserted. Carol J. Miller, Annotation, Bank's "Reasonable Commercial Standards" Defense Under UCC § 3-419(3), 49 A.L.R.4th 888, § 2[b] (1986); Michael A. Rosenhouse, Annotation, Payee's Right of Recovery, in Conversion Under UCC § 3-419(1)(c), For Money Paid on Unauthorized Indorsement, 23 A.L.R.4th 855, § 2[b] (1983). See also National Sur. Corp. v. Citizens State Bank, 651 P.2d 460, 462 (Colo.Ct.App.1982). Just as was the case in deciding whether Sands's actual authority extended to his subsequent activities, the issue of whether Citizens did or did not act in accordance with a specific standard of care is a question of fact better left for juries to decide given the testimony presented.
¶ 41. In this case, we are faced with the issue of whether the actions, or inactions for that matter, of Citizens in accepting the checks presented for deposit by Sands was undertaken in accord with "reasonable commercial standards" as relates to the banking industry. We note that in addressing whether the bank acted in a reasonable commercial manner, it is not enough to weigh the bank's actions against its own commercial standards. The bank's actions must be weighed against good faith dealings and reasonable commercial standards as apply to the banking industry. Siegel Trading Co. v. Coral Ridge Nat'l. Bank, 328 So.2d 476, 478 (Fla.Dist.Ct.App.1976).
¶ 42. "Reasonableness," as it pertains to the transactions at issue, is defined as whether a reasonable person would be on notice that something is running afoul of what is commercially reasonable, whether from some impropriety appearing in the form of the instrument and the accompanying endorsements or from knowledge of extrinsic facts outside of the instrument itself. Trust Co. of Georgia Bank of Savannah, N.A. v. Port Terminal & Warehousing Co., 153 Ga.App. 735, 266 S.E.2d 254, 258 (1980). See also First Rome Bank v. Reese Oil Co., Inc., 206 Ga.App. 667, 426 S.E.2d 384 (1992) (holding that material issue of fact as to whether bank acted with commercial reasonableness in cashing corporate checks *876 accompanied by only stamped endorsement precluded entry of summary judgment in corporate customer's favor on its conversion claim); Hydroflo Corp. v. First Nat'l. Bank of Omaha, 217 Neb. 20, 349 N.W.2d 615, 619 (1984) (holding that the issue of whether a bank has acted in a commercially reasonable manner is a question of fact, and where reasonable minds could differ as to the conclusions or inferences to be drawn from the evidence, such issues must be submitted to the jury).
¶ 43. We need not discuss further the viability of the claims, with respect to conversion and negligence, against Citizens and William Dawson as an avenue of redress for the asserted wrongs. Clearly there exists within the provisions of the UCC, specifically § 3-419 as codified in Miss.Code Ann. § 75-3-419, just such an avenue. In the instant case, there is no doubt that Sands had the actual authority to operate the day-to-day activities of the two corporations. This included the actual authority to endorse, restrictively, checks received and payable to the respective corporations for deposit to their accounts as approved by the board of directors. However, what is in doubt, as evidenced in the testimony presented, is whether the scope of Sands's authority extended beyond the above stated authority. In other words, were the endorsements and subsequent deposits to the two "sham" accounts at Citizens an extenuation of Sands's actual authority to operate the day-to-day activities. As previously discussed, Latimer testified to the contrary.
¶ 44. Latimer testified that Sands was well aware, as partner and president, that Delta, Inc.'s only approved depositary bank was Northwest Bank in Tunica, Mississippi, as limited by the original agreement between Delta, Inc. and First Systems Bank. Latimer also testified that Sands was never authorized by the board of directors to open separate accounts with Citizens or any other bank for that matter. Likewise, Latimer testified that Elaine Inc.'s only approved depositary bank was with First National Bank in Helen, Arkansas, and that Elaine's board of directors never authorized Sands to open separate accounts.
¶ 45. It therefore follows that from the evidence presented, the directed verdict was erroneously granted with respect to Delta Inc. and Elaine, Inc.'s claims of conversion and negligence. This is said in light of our well established standard of review. It can be reasonably adduced that sufficient evidence was presented, from which reasonable minds could differ, to overcome a directed verdict. Further, with respect to the "reasonable commercial standard" defense, we likewise find that sufficient evidence was presented to overcome any finding from the bench that Citizens had met this standard or that the plaintiffs had failed in their burden. Consequently, it remains a disputed issue.
¶ 46. William Dawson, himself, admitted that checks made payable to a corporate entity and bearing the "Inc." name as proper payee should not be deposited into "non-Inc." sole proprietorship accounts. We find that this testimony alone is sufficient evidence to at least allow the issue of whether Citizens acted in accordance with "reasonable commercial standards" in accepting the checks for deposit to go to a jury. Therefore, we reverse and remand for a new trial with respect to the claims of conversion and negligence.

B. Conspiracy to Defraud.
¶ 47. Finally, we address Delta, Inc. and Elaine, Inc.'s third claim of liability: that Citizens, through its employees and officers, together with William Dawson and Joyce Dawson, jointly and severally, *877 intentionally by both false representation and fraudulent concealment entered into a conspiracy with Sands to defraud Delta, Inc. and Elaine, Inc. The two companies, Delta, Inc. and Elaine, Inc., assert that a conspiracy existed between Sands, Joyce Dawson, and William Dawson, as an employee of Citizens, to defraud and convert funds belonging to Delta, Inc. and Elaine, Inc. into other or personal funds from which the Dawson's benefitted. Delta, Inc. and Elaine, Inc., in support of said contention, argue that the evidence produced at trial sufficiently established a common intent to commit fraud and enter into a conspiracy. Delta, Inc. and Elaine, Inc. maintain that as proof of the conspiracy between the Dawsons and Sands to defraud both companies, the following strongly supports their claim: 1) the existence of a close, personal, and lifelong friendship between the Dawsons and Sands, 2) the cooperative investments ventures and mutual business assistance between the Dawsons and Sands, 3) that Joyce Dawson was employed by Sands as his bookkeeper for Byhalia Oil Company, 4) that the Dawson's children received compensation from Sands from his other businesses, and 5) that the Dawsons received personal gain and benefit from Sands in the form of various favorable personal loans, purchases, and payments through his other businesses.
¶ 48. In addition to the above listed facts, Delta, Inc. and Elaine, Inc. further assert with respect to the activities of William Dawson that specific evidence exists to have precluded the trial court's grant of a directed verdict as to William Dawson on the claim of conspiracy. They are, in part, as follows: 1) that William Dawson had knowledge of the incorporated status of both Delta, Inc. and Elaine, Inc. yet nevertheless directed his secretary to open the two "sham" sole proprietorship accounts for Sands, 2) that William Dawson furthered the fraudulent activities of Sands and participated in the alleged conspiracy by directing that all banking statements pertaining to the two "sham" accounts, "Do not mail, Give: Bill Dawson", and 3) that William Dawson further aided Sands by retaining the endorsement stamps for Delta Chemical and Petroleum (Not Inc.) and Elaine Chemical (Not Inc.) personally in his desk drawer at Citizens and even personally utilized said endorsement stamps on occasion at Sands's direction. Both Delta, Inc. and Elaine, Inc. argue that these instances, which are supported by the record and brought out at trial, are more than sufficient to have overcome a directed verdict, thus allowing the issue to go to a jury. We agree, at least as far as any conspiracy between Sands and William Dawson, as an employee of Citizens, is concerned.
¶ 49. A "conspiracy" has been termed as "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." Levens v. Campbell, 733 So.2d 753 (¶ 32) (Miss.1999) (citing Shaw v. Burchfield, 481 So.2d 247, 255 (Miss.1985)). While Mississippi has never expressly defined the elements in a conspiracy to defraud suit, we agree that the common elements, generally accepted, are: 1) a conspiracy; 2) an overt act of fraud in furtherance of the conspiracy; and 3) damages to the plaintiff as a result of the fraud. Bosak v. McDonough, 192 Ill.App.3d 799, 139 Ill.Dec. 917, 549 N.E.2d 643, 646 (1989).
¶ 50. The difficulty in the instant case is that despite the evidence put forth by the plaintiffs, that the Dawsons and Sands were long time personal friends, co-investors, and sometimes acted as employee and employer, the evidence put forth nevertheless is comprised of nothing more than speculation and conjecture without *878 any direct, or indirect for that matter, proof that they were participants in the fraudulent activities of Sands, as far as Joyce Dawson is concerned. These activities and relationships are equally unpersuasive as to William Dawson's alleged part as well. The fact that the Dawsons received some favorable loans and other items of compensation due to their personal relationship with Sands does not ipso facto create the existence of a conspiracy.
¶ 51. However, what is of great concern to this Court is the specific acts committed by William Dawson, as an employee of Citizens, and may be construed as evidence of his active part in the alleged conspiracy. Based on the evidence presented, we hold that differing conclusions, as to the activities of William Dawson, as an employee of Citizens, could be reached on the issue of his involvement in the alleged conspiracy. As to Joyce Dawson, without additional proof connecting her to the fraudulent activities of Sands, a suit cannot be maintained. From the evidence presented, with our familiar standard of review in mind, we hold that despite all the favorable inferences available the evidence was such that differing conclusions among reasonable and fairminded jurors could not be reached with respect to the conspiracy claim against Joyce Dawson. No reasonable linkage establishing a conspiracy, either directly or indirectly, between Joyce Dawson and Sands was put forth. Accordingly, we affirm the trial court's grant of directed verdict with respect to the claim of conspiracy against Joyce Dawson and reverse and remand with respect to the claim of conspiracy against William Dawson and Citizens.

STATUTE OF LIMITATIONS
¶ 52. Citizens Bank of Byhalia, William Dawson, and Joyce Dawson argue that this court ignored or completely overlooked the statute of limitations bar in the instant case. However, we did not address this issue because the issue was not raised on direct appeal, and the appellees failed to file a cross-appeal. Maupin v. Estate of Perry, 396 So.2d 613, 616 (Miss.1981). In order for the appellee to gain reversal of any part of the decision of a trial court about which the appellant brings no complaint, the appellee is required to file a cross-appeal. Brock v. Hankins Lumber Company, 2000 WL 1811566 (Miss.App.). Because the statute of limitations issue was never raised, it is not properly before this Court. See, e.g., Board of Trustees v. Knox, 688 So.2d 778, 782 n. 1 (Miss.1997) (declining to consider "points of error" raised by appellee who did not file cross-appeal); Reynolds v. State, 585 So.2d 753 (Miss.1991) (refusing to address an allegation of error raised by the State regarding the appellant's sentence when no cross-appeal had been filed); Beck Enterprises, Inc. v. Hester, 512 So.2d 672, 678-79 (Miss. 1987) (Court will not consider issues not raised on direct appeal or on cross-appeal).
¶ 53. THE JUDGMENT OF THE CIRCUIT COURT OF MARSHALL COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE ASSESSED EQUALLY AMONG THE PARTIES.
KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, AND PAYNE, JJ., CONCUR. MCMILLIN, C.J., CHANDLER AND MYERS, JJ., NOT PARTICIPATING.