477 So.2d 265 (1985)
Austin W. WHITE
v.
HANCOCK BANK.
No. 55045.
Supreme Court of Mississippi.
September 25, 1985.
Rehearing Denied November 6, 1985.
*266 Thomas E. Vaughn, Alben N. Hopkins, Hopkins, Logan, Vaughn & Anderson, Gulfport, for appellant.
Knox White, John M. Harral, White & Morse, Gulfport, Barkley Clark, Lawrence, Kan., for appellee.
Before PATTERSON, C.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This action represents a salvage effort by a Gulf Coast businessman undertaken in the wake of his shipwrecked effort to sell his gasoline distributorship business to a then unbeknownst con artist. Our purchaser-villian, bled the business dry and has left for parts unknown, no doubt from whence he came. His business destroyed, our seller sought a solvent defendant. He picked his long time banker, who at best has an incidental connection with the seller's debacle.
The ensuing lawsuit has led to the instant appeal which presents less than as ordinary questions regarding the liability vel non of a bank for losses said to have been occasioned by reliance upon casual or informal comments made to a customer. Also presented are important questions regarding the rights and liabilities of the several parties affected when a fraudulent maker presents a check bearing a forged certification to one who in turn endorses and delivers the check to the depository/collecting Bank only ultimately to have the West Indies drawee bank refuse payment and dishonor the check. Faithful application of the law of this state to the facts of this case require that we resolve these issues in favor of the Bank and affirm the judgment of the trial court.

II.

A.
Though culminating on February 15, 1978, this story has its genesis in the wake of Hurricane Camille in 1969, for in that year Austin W. White, Plaintiff below and Appellant here, and D.G. Seago, Jr., created a corporation, Mark Oil, Inc., and through that vehicle proceeded to engage in the sale, both retail and wholesale, of petroleum products in the Mississippi Gulf Coast area. Seago primarily provided financial resources to the new company, while White provided management. At the outset, White owned approximately one-fourth *267 of the outstanding common stock of the corporation. Over the years the corporation retired (and held as treasury stock) portions of Seago's stock until the interests of White and Seago in the corporation were approximately equal.
At the beginning Mark Oil was pumping approximately 87,000 gallons of fuel a year in the Gulf Coast area. By 1976 the company's annual volume had increased to 36,000,000 gallons of product pumped through its service stations. During this time the company's primary banking relationship was with Hancock Bank of Gulfport, Mississippi. The Bank's officer with whom Mark Oil primarily dealt was Buddy Hutchins, senior vice president.
In 1976 or 1977 White, by reason of a combination of health and other personal reasons, determined that the company should be sold. In early February of 1978 White reached a tentative agreement with Walter Harvey and Patrick McGlon for this sale, one feature of which was to be a $250,000 down payment.
At this time the Bank was holding Seago's stock in the company by virtue of an escrow agreement. Prior thereto, White and Seago had entered into an agreement under which Mark Oil was purchasing all of Seago's stock and holding it as treasury stock. Some $79,000.00 had been paid toward this purchase but another $173,000.00 remained outstanding as White approached the sale to Harvey and McGlon. The sales agreement, accordingly, included provision for the payoff of the outstanding $173,000.00 owed to Seago and the release of his stock from the escrow agreement.
February 15, 1978, was fixed as the date for the closing of the sale. Hancock Bank had for some time known of White's efforts to sell the company. The Bank, however, had not been a party to the negotiations with Harvey and McGlon and did not learn of the sale until February 13, 1978. On that date Hutchins advised White that the transaction could be closed in the physical facilities housing the Hancock Bank Trust Department.
On February 14, 1978, Harvey, McGlon, White and his attorney, Earl Denham, met together at a local restaurant to go over the contract documents and finalize all arrangements. No representative of the Bank was present or invited. At this time McGlon insisted that the contract provision for the $250,000.00 down payment be changed from "cash" to "cash or certified check". White and his attorney agreed. They also agreed to delete a provision contained in an earlier draft of the sales contract to the effect that all stock in Mark Oil would be held in escrow until the purchasers had performed all of their obligations under the contract.
On the morning of February 15, 1978, Harvey, McGlon, White, Denham, Hutchins and a trust officer with the Hancock Bank met at the Bank and the various contract and sales documents were executed. At this time McGlon produced a check drawn on the Merchants & Shipowners Bank, Kingston, St. Vincent, West Indies, on the account of Dennis Enterprises, Inc., a Washington D.C. company, in the amount of $250,000.00, and purportedly certified by the Merchants & Shipowners Bank. The check was payable to Austin W. White and had been signed by McGlon on behalf of Dennis Enterprises, Inc. The check was presented to White who showed it to Hutchins. Hutchins asked White to step outside the room for a moment and then asked White what he thought about the check. White advised Hutchins, "I do not know anything about the check, I am not the banker." Hutchins responded that the check "looked all right to him" or "that he saw nothing wrong with it", or, according to White, "something of that nature". White did not ask Hutchins to have the check verified nor did Hutchins volunteer to do so. White then endorsed the check and delivered it to the Hancock Bank where it was placed in a savings account in the name of White and his wife.
At this point, the parties moved to pay off the $173,000.00 indebtedness owed to Seago for the purchase of the balance of his stock. Hancock Bank made a secured loan to White and Mark Oil, Inc. in the *268 amount of $173,000.00 and as security therefor White gave the Bank a security interest in the savings account, in which the $250,000.00 check had just been deposited. The net effect of all this was that, even though the check had not been verified or collected, Hancock Bank gave White immediate credit therefor.
White contends that the process for collection of the check was arguably unnecessarily delayed. Hancock Bank sent the check to a correspondent bank, the Whitney National Bank, in New Orleans, Louisiana. The Whitney Bank then took the check and sent it to the Trust Company Bank of Atlanta, Georgia, which in turn finally sent the check to the Merchants & Shipowners Bank in the West Indies for payment. On April 4, 1978, the parties learned that the check had been dishonored; that the certification was a forgery in that the West Indies bank had no certification procedure and therefore no certification was or could have been made by that bank; that the check was probably a forgery, inasmuch as the Merchants & Shipowners Bank had no account in the name of Dennis Enterprises, Inc.; and that the check itself was not printed by the bank or an authorized agent.
In the six weeks that intervened from the presentation of the check on February 15, 1978, the new purchasers had managed to deplete the resources of Mark Oil, Inc. Although White made an attempt to get back into the company and rehabilitate it, all too soon it became apparent that Mark Oil was gone with the wind.

B.
On January 22, 1980, Austin W. White commenced this civil action by filing his complaint in the Circuit Court of the First Judicial District of Harrison County, Mississippi. Hancock Bank, a Mississippi banking association, was named as the sole defendant. A second amended declaration charged that the Bank was negligent in failing to verify the $250,000.00 check, was negligent in the handling of that check and was generally negligent in the performance of various duties said to have been owed to White. White charged a breach of duties imposed by a fiduciary relationship said to have existed between himself and the Bank, that the Bank was guilty of negligent misrepresentations regarding the check. Finally the complaint charged that, upon discovery of defects in the check, the Bank had a duty to assist White in salvaging what he could but instead was grossly negligent in the protection of his rights. Plaintiff demanded actual damages, including consequential damages incident to the loss of his business and his business or credit reputation. The Bank denied the essential allegations of the complaint pleading particularly that the rights and liabilities of the parties were wholly determinable by reference to the provisions of Articles 3 and 4 of the Uniform Commercial Code as enacted in Mississippi, Miss. Code Ann. §§ 75-3-101 and -4-101, et seq. (1972).
After considerable discovery and other pretrial proceedings, the case was called for trial in circuit court in Gulfport on October 11, 1982. After some five days of trial and at the conclusion of Plaintiff White's evidence, the Bank moved for a directed verdict. The motion was granted by the trial judge who stated
I'm sorry that Mr. White did not gain the benefits of this sale, but in my opinion the bank was not at fault, or the cause of that check being bad. I think as a matter of law there is no liability on the bank in this case, and the motion of the Defendant to exclude the evidence and direct the jury to find for the Defendant is sustained. The Plaintiff, it seems, was dealing with a bunch of crooks, unbeknownst to him, probably, but he brought Mr. McGlon into the bank and with Mr. McGlon was a forged check. The Plaintiff endorsed this check thereby guaranteeing or warrantying the bank that he would stand behind it. So I think it would be unjust to make the bank stand for the loss. Therefore, the motion is sustained.
This appeal has followed.

III.
The motion for a directed verdict at the conclusion of a plaintiff's case tests *269 the legal sufficiency of the plaintiff's evidence, if no other proof be offered, to undergird an unassailable jury verdict in his favor should one be obtained. It asks the court to hold, as a matter of law, that the evidence is insufficient to support a verdict in favor of the non-movant plaintiff. Where such a request has been made, the trial court must consider the evidence before it at the time in the light most favorable to the party opposed to the motion. Weems v. American Security Insurance Company, 450 So.2d 431, 435 (Miss. 1984); King v. Dudley, 286 So.2d 814, 816 (Miss. 1973); Colson v. Sims, 254 Miss. 99, 180 So.2d 327 (1965). The plaintiff must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Holifield v. Nester Chevrolet Company, 207 So.2d 636, 637 (Miss. 1968). If the facts and inferences so considered point so overwhelmingly in favor of the defendant that reasonable men and women could not have arrived at a verdict for plaintiff, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men and women in the exercise of impartial judgment might reach different conclusions, the motion should be denied. See, e.g., Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Weems v. American Security Life Insurance Co., 450 So.2d 431, 435 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
We review the several assignments of error presented by White with these principles in mind, as our scope of review is informed thereby. To be specific, we take as true the evidence offered by White, speculating not on whether its credibility may have been undermined had the Bank gone forward with its case. We likewise give White the benefit of all reasonable favorable inferences that may be drawn from the evidence he offered.

IV.
One theory of recovery prominently advanced by White, here as below, is negligent misrepresentation. White charged and sought to prove that the Hancock Bank by its senior vice president, Buddy Hutchins, advised White that the check was a good, valid, collectible certified check when in fact Hutchins and the Bank did not know whether the check would be honored when presented. White charges that this was a negligent misrepresentation, that he relied upon it, and has as a result suffered great loss.
White recognizes that the Uniform Commercial Code as enacted into law in this state has much to say about his relationship with the Hancock Bank. He urges, however, that his present theory of recovery has a common law derivation which, by virtue of Miss. Code Ann. § 75-1-103 (1972), has not been displaced by the Code. That section provides
Unless displaced by the particular provisions of this Code, the principles of law and equity, including the law merchant and law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, ... shall supplement its provisions.
We have noted Section 75-1-103 in a variety of contexts and supplemented the UCC with our common law principles where appropriate. See, e.g., Bay Springs Forest Products, Inc. v. Wade, 435 So.2d 690, 694 n. 1 (Miss. 1983); Franklin v. Lovitt Equipment Co., Inc., 420 So.2d 1370, 1372 (Miss. 1982); Thomas v. Prewitt, 355 So.2d 657, 661-62 (Miss. 1978).
The common law of this state imposes upon banks and other financial institutions duties the breach of which may give certain parties a right of recovery on a theory of negligent misrepresentation. Shogyo International Corporation v. First National Bank of Clarksdale, 475 So.2d 425, 427 (Miss. 1985); Berkline Corporation v. Bank of Mississippi, 453 So.2d 699, 702 (Miss. 1984); First Money, Inc. v. Frisby, 369 So.2d 746, 760 (Miss. 1979); see also, *270 First American National Bank of Iuka v. Mitchell, 359 So.2d 1376, 1379 (Miss. 1978). In the context of the facts of this case, White's claim is not ousted by the UCC for the reason that the alleged negligent misrepresentation is said to have occurred prior in time (albeit only moments prior) to the advent of the depositor (White)  collecting bank (Hancock Bank) relationship. Put another way, the representation upon which White bases his claim was made before he endorsed the check and delivered it to Hancock Bank for deposit.
Shogyo and Berkline recognize that a plaintiff such as Austin White may recover of and from one such as Hancock Bank if plaintiff alleges and proves by a preponderance of the evidence
(a) A misrepresentation or omission of a fact;
(b) That the representation of omission is material or significant;
(c) That ... the bank officer failed to exercise that degree of diligence and expertise ... [the bank holds itself out to] the public ... [as possessing];
(d) That ... [the plaintiff] reasonably relied upon the bank's misrepresentation or omission; and
(e) That ... [the plaintiff] suffered damages as a direct and proximate result of such reasonable reliance.
Berkline, 453 So.2d at 702.
When White's evidence is viewed under these standards, and having in mind what we said in Part III above, it is found wanting in several respects.
First, the words attributed to Hutchins are vague and imprecise. As stated in White's brief, "Mr. Hutchins responded that it [the check] looked all right to him or that he saw nothing wrong with it or something of that nature, ... ." These words partake of the nature of an opinion, not a statement of fact. The first element of a claim for negligent misrepresentation is that the defendant has misrepresented or omitted to represent a fact. A mere expression of opinion is not actionable. Berkline Corp. v. Bank of Mississippi, 453 So.2d at 702; Bullard v. Citizens National Bank, 173 Miss. 450, 466, 160 So. 280, 282, Suggestion of error overruled, 173 Miss. 450, 470, 471, 162 So. 169, 169-70 (1935). Doubts regarding the vagueness of Hutchins' statements or White's memory thereof do not serve to create a jury issue. To have us hold that the directed verdict was erroneously granted, White must show strength in his interpretation of the facts, not weakness in the Bank's. In any event, statements, such as those made here, casual and off-the-cuff as they were, simply may not under our law serve as a predicate for a right of action.
Second, and more fundamentally, the evidence, even when viewed favorably to White, does not intersect with any obligation imposed upon the Bank by our law. There is no public law placing any such duty on the Bank, nor does the record reflect that by agreement or conduct the Bank saddled itself with any privately made legal duty in the premises. The evidence does not establish that White ever asked the Bank to advise him regarding the validity, collectibility or handling of the check. When the check was presented by McGlon, it was Hutchins, not White, who first raised an eyebrow. Nevertheless, White who at all times was represented by independent counsel never asked Hutchins that he or the Bank ascertain the status of the check. White may hardly be said to have reasonably relied on anything Hutchins said particularly where the Bank and Hutchins had not been professionally engaged to apply his expertise and render such an opinion.
On the uncontradicted facts, Patrick McGlon, Dennis Enterprises, Inc., and Merchants and Shipowners Bank were all strangers to Hancock Bank. This is a far cry from the facts in Berkline where plaintiff expressly requested credit facts regarding one of its customers, factual information within the four walls of the banking house and subject to accurate on the spot verification had the Bank exercised due diligence. Also, in Berkline the request was made under circumstances where it reasonably foresaw that the requesting *271 party would rely upon the information furnished. In Shogyo International the bank unequivocably advised an import firm that it had agreed to finance a local customer's purchase of "150,000 coasters at $.43 each in shipments of 50,000". Fundamental requisites to a claim for negligent misrepresentation is that the party making the representation did so under circumstances where he has been engaged to make the representation and reasonably should be foreseen that the other would rely substantially thereon.
The facts are undisputed that on February 15, 1978, White did not seek financial advice of and from the Bank nor did the Bank give financial advice. The reason the transaction was being closed at the Bank, in addition, to the practical necessity for having to have some place to close, was that it would be necessary to release the Seago stock which the Bank was holding under an escrow agreement, which, in turn, would necessitate White obtaining a loan from the Bank. Further evidence that White was not relying upon the Bank at the time was that he had his own attorney present to represent his interests at closing.
Much is made by Austin White of the fact that the Bank lulled him into a false sense of security by giving immediate credit and then making a loan on a portion of the amount deposited and otherwise treating the check as though it were good. These things all occurred, however, after the die was cast  after White had accepted the check, endorsed it and delivered it to the Hancock Bank for deposit into his savings account. There is no evidence that any of these actions induced White to accept the check in the first place, nor as a matter of logic could they.

B.
Next, White asserts a common law negligence claim, one not altogether severable from the claim of negligent misrepresentation. White claims that the Hancock Bank was negligent in just about everything that it did with reference to the check  beginning with its failure to verify or establish the collectibility of the check before White accepted it through alleged negligent delay in routing and presenting the check to the drawee bank for payment.
Again we are told that this general negligence claim is alive and well in our law by virtue of Miss. Code Ann. § 75-1-103 (1972). This is true up to a point  the point where White endorsed the check and delivered it to the Bank, for after that moment the rights and responsibilities of the parties are determined by reference to the Mississippi Uniform Commercial Code.
So limited, White's negligence claim is that the Bank failed to ascertain the validity and collectibility of the check before "letting" White accept it. To be sure, the Bank took no independent steps to check on the check. The claim fails because on these facts the Bank had no duty, fiduciary or otherwise, to do so. See Duncan v. Coahoma Bank, 397 So.2d 891, 894 (Miss. 1981). Contrary to White's wishful thinking, there is no evidence of a confidential relationship between the Bank and White. There are no facts before us which establish that the Bank undertook to represent or act for White in this matter. Raising an eyebrow at the sight of the check drawn on a West Indies bank did not convert Hutchins and the Hancock Bank into financial good Samaritans who thereby assumed a duty to be sure the check was good before White accepted it. See, Espy v. First National Bank of Cincinnati, 85 U.S. (18 Wall.) 604, 21 L.Ed. 947 (1873); Burke v. The First Peoples Bank of New Jersey, 172 N.J. Super. 539, 412 A.2d 1089, 1093 (1980).

V.
Once White endorsed the check and delivered it to the bank, he entered the world of the Uniform Commercial Code. As an endorser, White became obligated, upon dishonor, to pay the instrument according to its tenor. Miss. Code Ann. § 75-3-414(1) and 4-207(2) (1972). More specifically, he warranted that all signatures, including Dennis Enterprises, Inc., per Patrick McGlon and the certification by the Merchants *272 & Shipowners Bank, were "genuine and authorized". Miss. Code Ann. § 75-4-207(2)(b) (1972); see Mississippi Bank & Trust Co. v. County Supplies & Diesel Service, Inc., 253 So.2d 828, 830 (Miss. 1971).
The fraudulent check with which we are here concerned was dishonored by the drawee bank, the Merchants & Shipowners Bank. That bank advised that its purported certification had been forged and that it had no account in the name of Dennis Enterprises, Inc. Under such circumstances, the UCC places the risk of fraud loss on the fraudulent maker's transferee, in this instance Austin White. Put another way, once the drawee bank refused to pay the fraudulent check, the warranties imposed by Section 75-4-207 serve to kick the loss back upstream to each bank along the chain of collection in order of handling. The drawee can shift the loss back to the presenting bank, which in turn shifts the loss back along the chain. Through this chain of warranties, the loss finally lands on the shoulders of the party who first took the item from the fraudulent maker. That party is Austin White. No doubt, White has a right of action against McGlon. Equally without doubt is that such right is of little value and offers White no comfort here.
Under these rules, had Hancock Bank given White the money, as distinguished from giving him immediate credit, the bank upon dishonor of the check by the drawee and after being called upon to honor its own Section 4-207 warranty, would have had an action against White for breach of his warranties under Sections 3-414(1) and 4-207(2)(b). Munson v. American National Bank & Trust Co. of Chicago, 484 F.2d 620, 625 (7th Cir.1973). As matters stood in fact, the Bank of right made a $250,000.00 chargeback against White's savings account. 622 West 113th St. Corp. v. Chemical Bank New York Trust Co., 52 Misc.2d 444, 276 N.Y.S.2d 85 (1966). In this context it seems anomalous that White is suing the bank.
Notwithstanding that his case is seen sinking fast once the UCC is encountered, White next claims his evidence made out a jury issue on whether the Bank has breached certain statutory duties said to have been owing by it by virtue of its status as a collecting bank. Such breaches, we are told, entitled White to recovery of damages, coupled with a waiver of the warranties of Sections 3-414 and 4-207. White calls to our attention Miss. Code Ann. § 75-4-202(1) (1972) which provides:
A collecting bank must use ordinary care in
(a) presenting an item or sending it for presentment.
White seeks to flesh out this statutory duty of ordinary care by referring us to the provisions of Miss. Code Ann. § 75-4-204 (1972).
Sufficient unto the moment is the language of Miss. Code Ann. § 75-4-103(5) to the effect that
The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, ... .
White complains of the delay between February 15, 1978  the date on which he delivered the check to the bank  and April 4, 1978, the date on which the check was dishonored. The problem with White's argument is that the check was just as worthless on February 15 as it was on April 4. If immediately upon its receipt of the check, Hancock Bank had flown a representative to Kingston and presented the check for payment on the Merchants and Shipowners Bank, the result would have been the same. Under these circumstances Section 75-4-103(5) shuts this particular door in White's face, cf. Whalen & Sons Grain Co. v. Missouri Delta Bank, 496 F. Supp. 211 (Ed.Mo. 1980); see also Wells Fargo Bank v. Hartford National Bank & Trust Co., 484 F. Supp. 817, 822-23 (D.Conn. 1980), and cases such as Gulf Coast State Bank v. Emenhiser, 562 S.W.2d 449 (Tex. 1978) avail White nothing.
*273 White's claim for consequential damages  Mark Oil, he argues, could have been saved if he had known promptly that McGlon's check was fraudulently made and that it contained a forged certification  fares no better. Damages above the face amount of the check are recoverable only if "bad faith" is shown. Miss. Code Ann. § 75-4-103(5). White has neither alleged nor made any attempt to prove bad faith on the part of Hancock Bank.
Finally, White relies on Sections 75-4-202 and 4-204 as a mechanism for negating the warranties of Section 75-3-414(1) and 4-207(2)(b). These warranties may be modified or waived by agreement of the parties. Miss. Code Ann. §§ 75-1-102(3) and 4-103(1) (1972). Nothing in the Code suggests that they may be waived or lost by violations of duties imposed under §§ 75-4-202 and 4-204. We are loathe to import terms and provisions not there into the Code's schematic.
For perspective, we emphasize that this is not a case we may decide by reference to any extra-legal notions of fairness or justice. The adjudication of the issues discussed in this Part V is the function of the Uniform Commercial Code as enacted at the legislature in this state, Miss. Code Ann. §§ 75-1-101, et seq. (1972), coupled with and supplemented only by such common law rules as may be allowed in under § 75-1-103. The time for arguments of fairness and equity was before enactment of the Code. Indeed, those grand policy considerations were then given careful attention and are reflected in the specific provisions of the Code. Our task now is the faithful application and enforcement of that carefully honed code.
The statutorily declared purposes and policies of the UCC include "to simplify, clarify and modernize the law grooming commercial transactions". Miss. Code Ann. § 75-1-102(2)(a) (1972). Regarding the subjects of commercial paper and bank deposits and collections, the Code places a premium upon achievement of certainty in rules and obligations and predictability of consequences of behavior, for the notions of commercial justice and fairness that went into the shaping of Articles 3 and 4 would be seriously undermined by anything other than our sticking as closely as possible to the letter of the law.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
WALKER, P.J., not participating.