819 So.2d 3 (2001)
HANCOCK BANK, Appellant,
v.
Olga ENSENAT, Appellee.
No. 1999-CA-01189-COA.
Court of Appeals of Mississippi.
December 18, 2001.
Rehearing Denied June 11, 2002.
*4 David W. Crane, Gulfport, Attorney for Appellant.
James F. Thompson, Gulfport, Harry B. Ward, Bay St. Louis, Attorneys for Appellee.
Before SOUTHWICK, P.J., BRIDGES, and IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Olga Ensenat, who is now deceased, was an elderly woman who had substantial investment accounts. At least she did prior to her niece's coming to live with her. The niece would be convicted of embezzlement for her withdrawals from those accounts *5 and the converting of significant portions of the funds to her own use. Before us is Ensenat's suit against Hancock Bank, where the embezzled funds were initially deposited with the niece's forged endorsements on investment account checks. After a jury trial, Hancock Bank was found liable for $185,000 in damages. We agree with Hancock Bank that the Uniform Commercial Code limits the banks' liability for actual damages to the amount of funds improperly withdrawn. The trial judge refused to present the case to the jury on that theory. We find that this error so distorted the presentation of factual issues that we cannot enter judgment here. We reverse and remand for further proceedings.

STATEMENT OF FACTS
¶ 2. Olga Ensenat was 88 years old at the time of the relevant withdrawals from her accounts at Franklin Templeton Investor Services and Scudder Investor Services. On January 23, 1996, Ensenat filed suit against the investment account services and Hancock Bank. Ensenat alleged that she did not herself withdraw or authorize any other person to withdraw retirement funds from Scudder in the amount of $107,386.30 in three transactions in April and May 1995, or from Franklin in the amount of $50,000 in May 1995. Hancock Bank was said to be responsible because it allowed the checks to be paid or deposited without her endorsement, signature, or authorization.
¶ 3. Ensenat's suit sought recovery against all three defendants based on theories of breach of contract, bad faith breach of contract, negligence, and gross or reckless conduct disregarding her interests. Ensenat sought actual damages of $157,386.30, which was the face amount of the checks, an undetermined amount for loss of interest and dividend income, other undetermined damages, court costs, attorney's fees, and punitive damages.
¶ 4. Hancock Bank admitted that the checks had been deposited into accounts at its bank. Among other allegations, the bank raised the absence of the niece Diana Flores and Alicia R. Smith as necessary parties. In September 1996, Flores pled guilty to three counts of grand larceny for having taken this money and agreed to restitution in the amount of $168,636.30. Smith was Ensenat's sister whose accounts also had been used by Flores. Flores but not Smith was added as a party.
¶ 5. Ensenat's claims of punitive damages against Scudder and Franklin were dismissed on summary judgment. Franklin was later dismissed entirely from the suit as the court found that it had not violated its internal operating procedures in disbursing the retirement funds and did not act negligently. Ensenat's breach of contract and negligence claims against Scudder were dismissed on summary judgment as to one of the three transactions. Scudder later settled for $35,000 and all claims against it were dismissed.
¶ 6. After the issue of Ensenat's mental capacity was raised by Hancock Bank, her counsel filed for a conservatorship and the appointment of a guardian ad litem. On March 10, 1998, the circuit court entered an order appointing a guardian.
¶ 7. A three-day trial began on May 12, 1998. The proof showed that Ensenat's sole account at Hancock Bank was one she held jointly with Alicia Smith. Smith also had a separate account. Flores maintained her own checking account at Hancock Bank. There were four checks in question, one of which was deposited in two even $25,000 shares.

*6
 Payee Date Amount Deposit Account(s)
Check No. 1 Olga Ensenat 4/25/95 $ 50,000.00 Flores
Check No. 2 Olga Ensenat 4/27/95 $ 50,000.00 (Split) Ensenat/Smith and Smith
Check No. 3 Olga Ensenat 5/10/95 $ 7,386.30 Ensenat/Smith
Check No. 4 Olga Ensenat 5/16/95 $ 50,000.00 Flores
 ___________
 $157,386.30

¶ 8. Charles A. Breath, vice-president of Hancock Bank's Pass Christian branch, testified that he first became aware of Ensenat's financial loss in December 1995 when he received a letter from Ensenat's attorney. The bank's legal department attempted to contact Ensenat. Breath and other witnesses testified as to some of the departures from established banking procedures that had occurred. Hancock Bank had a "know your customer" policy for the purposes of identifying those conducting business at the bank. Diana Flores' account application contained no employment information but it did state that she was the niece of Alicia Smith. Flores opened the account in February 1995 and the first $50,000 check was deposited into that account in April 1995. Breath testified that Flores' deposit of such an amount in her account two months after opening it would not have been cause for suspicion. For large deposits a teller might have to seek the authorization of a supervisor before completing the transaction.
¶ 9. Jackie Dennison, a manager in branch administration, testified that tellers have deposit limits. An inexperienced teller might be limited to taking deposits of $300 without supervisor approval while an experienced teller might be limited to taking deposits of $5000 without supervisor approval. Account signature cards were kept at a central location and not at the branches. Any account less than ninety-days old would be "flagged" and a teller was to scrutinize each item presented. This would include asking for proper identification if the teller was unfamiliar with the individual making the deposit. The $50,000 check deposited by way of the ATM should have been referred to a supervisor who could have placed a "hold" on the account.
¶ 10. The bank's teller manual stated that "[i]t is very important that the teller know the endorsement of the person with whom he or she is dealing with because the bank must guarantee all prior endorsements." A check could be refused for deposit but it would then be mailed to the payee. Hancock Bank would never return such a check to the maker. Diana Flores' name appeared as an endorsement on all but one of the four checks.
¶ 11. Dennison testified that the three $50,000 checks should have been initialed by a supervisor, but it did not appear that a supervisor had in fact approved the checks for deposit. Approval by a supervisor should have been sought for the deposit that was split between Ensenat and Smith's accounts. Each of the tellers handling these four checks had less than one year of experience. As for the check that was endorsed "Olga Ensenat by Alicia R. Smith," the teller should have contacted the "deposit operations department" to determine if Smith had a power of attorney.
¶ 12. Harrison County Administrator John McDonnell was appointed guardian ad litem for Ensenat during the pendency of this suit. No conservatorship or guardianship previously had been created, but Ensenat's nephew, Juan Smith, was in charge of her affairs prior to his death. McDonnell did not believe that Hancock Bank had a part in Flores' taking of Ensenat's funds. Flores stole the funds by "forg[ing] Mrs. Ensenat's name to the back of certain checks that were then handled by Hancock Bank and paid into her *7 account"; Flores "made telephone calls to the individual accounts and then followed up some written correspondence forging Ensenat's name."
¶ 13. Judy Meador, operations officer at the Pass Christian branch of Hancock Bank, testified that she investigated Ensenat's account. She believed that the two tellers who handled the four checks most likely had a $1,000 deposit limit. Therefore each teller should have asked a supervisor to approve those deposits. Meador testified that neither of the tellers remembered these particular transactions. Each teller handled between 4,000 and 5,000 transactions per month.
¶ 14. When asked what Hancock Bank could have done, Meador testified that "we could have put a hold on the accounts, or the account that the check was going into, which would have been probably a five-day hold. That way you couldn't spend the money until those checks cleared. And then when they got to the payee bank, they would examine the check and the endorsements. If there was anything irregular, they would have sent them back to us, and we could have debited the customer's account and not let the money go through." Meador determined in her investigation that employees knew that Ensenat and Smith were sisters and that Flores was their niece.
¶ 15. Hancock Bank called Diana Flores as a witness. Flores testified that her aunt, Alicia Smith, requested that she move to Pass Christian to manage Smith's and Ensenat's affairs. A first cousin of Smith and Ensenat informed Flores of the existence of Ensenat's retirement accounts. This cousin gave her the paperwork for the accounts and told her how to withdraw money from the accounts. Flores alleged that she withdrew the funds to provide for her aunts. The first $50,000 check was allegedly used to pay Ensenat's nursing home and medical bills and also other personal expenses of Smith and Ensenat. Another check for more than $7,000 and half of a $50,000 check were deposited into Ensenat's account. Other funds were used to repair rental property owned by Ensenat in New Orleans and a house owned by Smith in Pass Christian. Flores testified that Alicia Smith had a power of attorney relating to Ensenat. Flores had complete control over the mail that arrived at the house. Flores had no idea how much she actually spent on Ensenat's care.
¶ 16. Flores testified that no family member ever contacted her about her aunts or how Ensenat's retirement funds were being spent. Ensenat's and Smith's families did not take great interest in their affairs. Flores thought that family members were aware that she was caring for her aunts.
¶ 17. The jury returned a verdict finding Hancock Bank was liable for Ensenat's losses and no fault was assessed to Ensenat. Hancock Bank was found not to be liable for what the instructions called "actual damage" or loss of interest but was liable for $38,000 in "compensatory damages," $20,000 in "consequential damages," and $157,000 in "bad faith" damages. The jury assessed $123,000 in "actual damages" against Flores and later assessed $400,000 in punitive damages against her.
¶ 18. On July 8, 1999, the circuit court granted Hancock Bank a remittitur in the amount of $35,000, an amount representing the settlement reached between Ensenat and Scudder. An error occurred in the subtraction, resulting in an order to pay $185,000. Reducing the original judgment of $215,000 by $35,000 should have resulted in a judgment of $180,000.
¶ 19. The record indicates that Ensenat died after this judgment and before December 1999.

*8 DISCUSSION
¶ 20. This suit concerns four checks issued by two investor service companies, sent to Ensenat's home address, and then fraudulently endorsed and deposited by her niece Flores. The total amount of the checks was $157,386.30. Hancock Bank's liability arises from its contractual and statutory duties to those who use its services. To what extent the bank was liable for the temporary success of Flores' fraud determines the recovery that is appropriate in this case.

1. Effect of Uniform Commercial Code
¶ 21. The parties do not agree on the applicability of the Uniform Commercial Code. Ensenat's attorney finds the Code optional, an option Ensenat sought to avoid by seeking recovery for various common law torts that allegedly arose from the manner in which Hancock Bank conducted its business. Just being an option is not the approach of the Code. Instead, the Code controls specific transactions and issues, while other doctrines supplement at the interstices and margins.
¶ 22. "This code shall be liberally construed and applied to promote its underlying purposes and policies." Miss.Code Ann. § 75-1-102(1) (Supp.2001). The purposes and policies are "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; (c) to make uniform the law among the various jurisdictions." Miss.Code Ann. § 75-1-102(2)(a)(c)(Supp.2001). "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." Miss.Code Ann. § 75-1-103 (Supp.2001).
¶ 23. Leaving the general guidance regarding the Code's application, we turn to the specific provisions regarding negotiable instruments in chapter 3 of the Code. Miss.Code Ann. § 75-3-102(a) (Supp.2001). A "negotiable instrument" is "an unconditional promise or order to pay a fixed amount of money, with or without interest... if it: (1)[i]s payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2)[i]s payable on demand or at a definite time; and (3)[d]oes not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money...." Miss.Code Ann. § 75-3-104(a)(1)-(3) (Supp.2001). The four checks were clearly "negotiable instruments."
¶ 24. The Code establishes the measure of Hancock Bank's liability for conversion. Miss.Code Ann. § 75-3-420 (Supp.2001). However, instead of bringing suit for conversion, Ensenat asserted breach of contract, bad faith breach of contract, negligence, and gross negligence and reckless disregard. She argues that because she chose to pursue her claims under theories outside the Uniform Commercial Code, and specifically because she did not bring an action labeled "conversion," that the Uniform Commercial Code is not applicable.
¶ 25. Ensenat suggests that a Supreme Court precedent supports her theory that these common law tort claims override the Uniform Commercial Code section.
White claims that the Hancock Bank was negligent in just about everything that it did with reference to the check beginning with its failure to verify or establish the collectibility of the check before White accepted it through alleged negligent delay in routing and presenting *9 the check to the drawee bank for payment.
Again we are told that this general negligence claim is alive and well in our law by virtue of Miss.Code Ann. §§ 75-1-103 (1972). This is true up to a point-the point where White endorsed the check and delivered it to the Bank, for after that moment the rights and responsibilities of the parties are determined by reference to the Mississippi Uniform Commercial Code....
Once White endorsed the check and delivered it to the bank, he entered the world of the Uniform Commercial Code.
White v. Hancock Bank, 477 So.2d 265, 271 (Miss.1985).
¶ 26. Thus, White supports that the Code governs here over common law forms of action. Once the checks were presented to the bank for deposit, the "rights and responsibilities of the parties are determined by reference to the Mississippi Uniform Commercial Code." Id.
¶ 27. Ensenat also argues that section 75-3-420 is an affirmative defense which Hancock Bank did not raise in its answer. An affirmative defense alleges that even if all the plaintiff's allegations are true, there are other facts that mandate judgment for the defendant. Satcher v. Wiser, 483 So.2d 694, 697 (Miss.1986). All Hancock Bank has raised is that the governing legal principles are found in the Code. The defendant's citing the correct law is not an affirmative defense.
¶ 28. We now look to what the Code provides regarding conversion.
(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.
(b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.
(c) A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.
Miss.Code Ann. § 75-3-420 (Rev.2000).
¶ 29. The first section indicates that to the extent Hancock Bank made payment on these negotiable instruments to Flores, who was a "person not entitled to enforce the instrument," it became liable for conversion. Flores herself also converted the four checks. Flores has been found criminally liable for her actions but apparently does not have the funds to satisfy civil liability.
¶ 30. There is a question under this section that should be mentioned. Mrs. Ensenat was the payee on the four checks. As such, she could not bring an action for conversion if she never received delivery "either directly or through delivery to an agent or co-payee." Miss.Code Ann. § 75-3-420(a)(ii) (Supp.2001). There is no evidence that Mrs. Ensenat ever physically possessed these checks. Once Flores made arrangements for Scudder and Franklin to send the checks to Ensenat's address, it was Flores who intercepted them. The official comments to this Code section explain what the term "delivery" *10 should mean in this context. These comments are drafted and approved in the same process of the American Law Institute and the National Commissioners on Uniform State Laws that leads to the Code language itself. UNIF. LAWS ANN. U.C.C. Prec. § 3-101, Refs & Annos. The official comments are thus the Code drafters' own expounding on provisions later enacted verbatim by our legislature. The Supreme Court has with some regularity looked to them for guidance. E.g., Great Southern National Bank v. McCullough Environmental Services, Inc., 595 So.2d 1282, 1287 (Miss.1992); Beck Enterprises, Inc. v. Hester, 512 So.2d 672, 676 (Miss.1987). The official Code comments are entitled to significant weight as aids to interpretation.
¶ 31. The official comments to section 3-420 state that a "payee receives delivery when the check comes into the payee's possession, as for example when it is put into the payee's mailbox." U.C.C. § 3-420 cmt. (1). Sufficient possession may also occur by the instrument's arrival at the payee's home mailing address. Daniel E. Murray, Revised Articles 3 And 4 of The Uniform Commercial Code: A Friendly Critique, 47 U. MIAMI L. REV. 337, 362 (1992) ("there must be delivery to the mailbox of the payee or indorsee"). Ensenat received delivery of the four checks. The comments explain that if a payee such as Ensenat was not "delivered" the instruments, then it is the investment service and not the bank that is liable. U.C.C. § 3-420 cmt (1).
¶ 32. Therefore, Hancock Bank was liable for conversion under the Code. The extent of its liability in damages is what we next address.

2. Measure of Damages Under the Uniform Commercial Code
¶ 33. The jury in this case was presented with a special interrogatory in order to assess damages. The interrogatory read in part as follows:
Question No. 1: Do you believe from a preponderance of the evidence that Plaintiff, Olga Ensenat is entitled to recover damages from Hancock Bank?
Answer: _____Yes _____No
If your answer to Question No. 1 is "no" then your verdict shall be: "we, the jury, find for the Defendant Hancock Bank."
If your answer to Question No. 1 is "yes", go to the next question:

 Hancock Bank Diana Flores
Actual Damages $_____ Actual Damages $_____
Interest $_____ Interest $_____
Compensatory Damages $_____ Compensatory Damages $_____
Consequential Damages $_____ Consequential Damages $_____
Bad Faith $_____ Bad Faith $_____
 Total $_____ Total $_____

The jury assessed Hancock Bank with no liability for actual damages or interest, $38,000 in compensatory damages, $20,000 in consequential damages, and $157,000 in "bad faith" damages. The total amount was $215,000. Flores was assessed with liability for $123,000 in actual damages.
¶ 34. Despite the instruction's reference to "bad faith," the trial judge had earlier refused to allow the jury to consider assessing punitive damages against Hancock Bank.
*11 ¶ 35. The court defined actual damages as "the financial losses sustained ... by virtue of the checks deposited in the accounts." Compensatory damages were defined as "loss of her dividends or interest" and also an award to make Ensenat whole which included "physical injury, pain and suffering, mental anguish, shock and discomfort." Consequential damages were defined as "attorney's fees, costs of litigation, and court costs." We review the propriety of these categories.
¶ 36. In a conversion suit, "the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiffs interest in the instrument." Miss.Code Ann. § 75-3-420(b)(Supp.2001). Another relevant but general Code provision is that damages under the Code should place the aggrieved party "in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this code or by other rule of law." Miss.Code Ann. § 75-1-106(1)(1972). The official comments to section 1-106 state that this section was intended "to make it clear that compensatory damages are limited to compensation. They do not include consequential or special damages, or penal damages; and the Act elsewhere makes it clear that damages must be minimized."
¶ 37. Consequential damages are specifically allowed in some situations governed by the Code, such as for breach of a sales contract. Miss.Code Ann. §§ 75-2-701 & 75-2-715 (Rev.1981 & Supp.2001). No similar provision exists for conversion of negotiable instruments. We also find meaning from the fact that the Code prior to amendments in 1992 provided that the depositary bank's liability was limited to the funds remaining in its possession if it dealt with the converted instrument in "good faith and in accordance with the reasonable commercial standards applicable to the business...." Miss.Code Ann. § 75-3-419(3) (Rev.1981), replaced by adoption of 1992 Miss. Laws ch. 420, § 57.[1] The good faith commercial standards defense ended and a depositary bank is presumed to be liable for the entire amount "payable on the instrument...." Miss. Code Ann. § 75-3-420(b); Michael D. Sabbath, UCC Update: Revised Articles 3 And 4, 48 MERCER L.REV. 83, 93-94 (1996) (depositary bank "fully liable" for amount of instrument).
¶ 38. Therefore the Code recognizes, both earlier and now, that there ought to be reduced liability for some unwitting participants in a conversion who acted reasonably. The reduction is from being liable for the entire amount payable on the instrument to the amount that is still in the hands of the participant. Under former section 75-3-419, when a depositary bank did not follow commercially reasonable practices, it was liable for the amount payable on the instrument; if it acted reasonably, it was liable for less. Under present section 75-3-420 a depositary bank has lost this reduced liability. Such a bank now is always liable for the plaintiffs interest in the face amount of the instrument, whether the bank acted reasonably or unreasonably.
¶ 39. However, the Code in no way suggests that there is yet another category of conduct above commercially unreasonable action but below what creates exposure to punitive damages. A Code that is intended to simplify and make uniform the *12 rules governing commercial transactions instead would be making the rules more complex and subjective.
¶ 40. Section 75-3-420 was both enlarging the depositary bank's liability but also placing a limit. The statutory command that the "measure of liability is presumed to be amount payable on the instrument," but it would be less if the plaintiff did not own the entire instrument, is a clear statement restricting further actual damages. This limit would include not just the face amount of the instrument but also the interest that was payable, since interest is an "amount payable on the instrument." Incidental and consequential damages, therefore, are barred.
¶ 41. Other courts even under section 3-419 found that the Code "displaces the common law action for the negligent acceptance for deposit of a check with an unauthorized Indorsement." Flavor-Inn, Inc. v. NCNB National Bank, 309 S.C. 508, 424 S.E.2d 534, 536 (1992)(citing cases from other jurisdictions). Common law negligence or other tort actions were subsumed into the Code rules. "The statute, plain as it is, leaves no room for the recovery of an additional amount as consequential damages." Flavor-Inn, 424 S.E.2d at 537. The court found that the plain language of section 75-3-420(2) limits actual damages to the plaintiff's interest in the amount payable on the instrument and bars incidental and consequential damages.
¶ 42. What is left is whether an award that is not intended to compensate the victim but which instead is to serve other remedial purposes might still be authorized. The South Carolina court found that punitive damages remained a possible option despite the limitations of the Code. Flavor-Inn, 424 S.E.2d at 537. We agree that the adoption of this Code did not eliminate the potential for punitive damages arising from acts that contribute to conversion of a negotiable instrument. Ensenat's request for punitive damages was not submitted to the jury. The trial court reviewed the evidence, included a sealed explanation of relevant banking practices, and found no basis for an award of punitive damages.
¶ 43. One of the difficulties in considering the punitive damage issue is that Ensenat did not file a cross-appeal on the question. If a party is dissatisfied with some part of a trial court's judgment, but the other party has filed the initial notice of appeal, it has fourteen days from that notice to file a cross-appeal. M.R.A.P. 4(c). Failure to file a cross-appeal usually prevents an issue from receiving appellate review. Lindsey v. Lindsey, 612 So.2d 376, 378 (Miss.1992).
¶ 44. We do not address whether the facts presented would have justified a punitive damage instruction. For reasons we will explain immediately below, we find that other errors by the trial court require that we reverse and remand. If a new trial is held, this issue can be reconsidered based on the evidence that is then presented.
¶ 45. Though we have found that Ensenat was limited to a cause of action for conversion under the Commercial Code, Hancock Bank failed to convince the trial court that this was the controlling law. The bank's motion in limine to prevent evidence of other damages from being submitted was denied. The trial court gave the parties an erroneous statement of controlling legal principles, which then led to presentation of evidence that followed those principles. We need not speculate as to all the effects that the parties' proceeding under the wrong theory might have had. It at least had the considerable potential to skew the evidentiary presentations of each party. The trial court's error in rejecting the conversion statute and allowing the case to be tried under other *13 theories was so fundamental to the potential course of the trial that we are required to reverse and remand.
¶ 46. The aggregate amount payable in the four checks was $157,386.30. That, plus any relevant interest, is the cap on the banks's liability for actual damages. If the evidentiary prerequisites for presenting an issue of punitive damages to the jury are met, then a bank might be liable for that.

3. Comparative fault under Article 3
¶ 47. Revised Article 3 of the Code provides that financial responsibility for the alteration or conversion of a negotiable instrument is subject to comparative fault principles. A loss may be allocated between someone "whose failure to exercise ordinary care substantially contributes ... to the making of a forged signature on an instrument" and another who "in good faith, pays the instrument or takes it for value or for collection," if that latter individual has failed "to exercise ordinary care in paying or taking the instrument and [that] failure substantially contributes to loss...." Miss.Code Ann. § 75-3-406(a) & (b) (Supp.2001).
¶ 48. Hancock argues that a variety of individuals and entities contributed to this loss. It alleges that Ensenat's mental weakness resulting from advanced age required that her family take steps properly to manage her affairs, as opposed to letting Flores manage Flores's affairs through Ensenat. Her family therefore was negligent in not obtaining a conservatorship.
¶ 49. The bank also argues that the two investment account services should have had fault allocated to them. Scudder settled for $35,000, while Franklin was dismissed on summary judgment because the trial court found that it had met its obligations towards Ensenat. Hancock does not appeal the dismissal of Franklin, so the finding that Franklin was not at fault is conclusively resolved. Scudder's potential responsibility for a different percentage of fault than its $35,000 settlement represented is something that might have been presented to the jury. Estate of Hunter v. General Motors Corp., 729 So.2d 1264, 1274 (Miss.1999). Finally, Hancock Bank argues that the prime mover in this conversion, Flores, needed to have fault assessed to her.
¶ 50. The Bank cites no authority and we have discovered none that negligence may be imputed to an individual because that individual's family failed to provide a guardian. Furthermore, someone such as Flores whose contribution to an injury arises from intentional acts should not normally be included in the allocation of fault to negligent parties. Dawson v. Townsend & Sons, Inc., 735 So.2d 1131, 1142 (Miss. Ct.App.1999), citing Miss.Code Ann. § 85-5-7 (Rev.1999). Whether that conclusion under the general statute on allocation of fault among tortfeasors applies equally to the specific allocation principles for conversion of negotiable instruments has not been briefed and for that reason we do not decide the question on this appeal. As to the other comparative fault issues, we find they are not presented to us for the reasons that we now explain.
¶ 51. Hancock Bank stipulated below and agrees on appeal that it owes at least the face amount of the converted instruments, less offsets for the $35,000 paid by Scudder and for any amount that Ensenat actually received in her account in 1995. Having stipulated that it owes this amount, Hancock's concern about allocating fault to others solely would affect any greater liability that it might be found to have. We have found that it has no liability properly assessable for actual damages under section 75-3-420 except for the amount payable on the instruments. That stipulation *14 removes any need for to analyze these questions further.

4. Credits against Hancock Bank's Liability
¶ 52. Other money received by Ensenat included $35,000 paid by Scudder as a result of this litigation. There was also proof that in 1995, out of the over $157,000 paid in four checks sent to Ensenat but intercepted by Flores, $32,386.30 was actually deposited in Ensenat's account. The remainder was placed either in Flores' or Alicia Smith's accounts.
¶ 53. The parties agreed at trial that the full amount of the $35,000 paid by Scudder should be credited to Hancock Bank's liability. Among other places, this appeared in a jury instruction:
The Court instructs the jury that it has been stipulated that the Plaintiffs should recover the total amount that was paid in response to checks presented by Diana Flores on behalf of Olga Ensenat in the sum of $157,386.30, less the amount paid by Scudder Investor Services, Inc. in the sum of $35,000, leaving a net balance due on the checks presented in the sum of $122,386.30 and you are instructed that Hancock Bank has tendered into the registry of the court the sum of $90,000.00 in payment of checks presented, leaving a net balance on all checks presented in the sum of $32,386.30; if you further find from the evidence that the Plaintiff received into her account any amount of the checks presented and paid by Hancock Bank, then you should deduct from the net balance of $32,386.30 any sums, if any, which the Plaintiff received into her account and if you find from the evidence that the Plaintiff received the total sum of $32,386.30 into her account from those checks paid by Hancock Bank, then in that event, you would not award any amount against Hancock Bank for checks presented and you would only consider the issue of compensatory damages, if any, to be awarded in this case.
¶ 54. In this instruction the parties accepted that the $35,000 was a credit against the $157,386.30. Based on that acceptance, we reduce Hancock's liability for actual damages to $122,386.30.
¶ 55. The remaining $32,386.30 was subject to conflicting evidence of whether Ensenat actually received that money. There was no realistic dispute that one of the $25,000 split deposits and the $7,386.30 check were placed in an account held jointly by Ensenat and her sister. Out of this account, Ensenat's expenses were met. Hancock Bank was charged with permitting conversion of the amounts payable on four separate checks totaling $157,386.30. There was $32,386.30 actually placed into the proper payee's account. Section 75-3-420 recognizes that "there should normally be no recovery when check proceeds come into the hands of the person for whom they are intended." 2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE 231, § 18-6 (4th ed.1995). Other income went into the account as well, such as Social Security benefits and some rental income. Before Ensenat would be entitled to have the bank pay her for money allegedly converted out of her own account, she must show by a preponderance of the evidence that the conversion occurred.
¶ 56. We consider the question of what money in addition to the $35,000 was actually received by Ensenat to be a matter properly resolved in further proceedings conducted on remand.

Conclusion
¶ 57. Hancock Bank's liability is controlled by the commercial code section on conversion. Whether negligent or not, Hancock Bank is liable for the plaintiff's interest in the amount payable on the converted instruments, less amounts actually received by the plaintiff.
*15 ¶ 58. We should not be read to hold that section 75-3-420 prevents interest from being paid. When an amount is received has an impact on its value. Interest that commences with the date of the conversion would be prejudgment interest. That is within the discretion of the trial judge. It requires that damages be liquidated and that a request appear in the complaint. Warwick v. Matheney, 603 So.2d 330, 342 (Miss.1992); Miss.Code Ann. § 75-17-1(1) (Rev.2000).
¶ 59. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS REVERSED AND THE CAUSE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPEAL COSTS ARE ASSESSED EQUALLY TO THE APPELLANT AND TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, IRVING, CHANDLER AND BRANTLEY, JJ., CONCUR. LEE AND MYERS, JJ., NOT PARTICIPATING.
NOTES
[1] This numbered Code section now deals with "instruments signed for accommodation"; "conversion of instruments" has been moved to section 75-3-420. The older, displaced section 75-3-419 and commercial reasonableness were discussed in Delta Chemical and Petroleum, Inc. v. Citizens Bank of Byhalia, Miss., 790 So.2d 862, 868 (Miss.Ct.App.2001).