891 So.2d 241 (2004)
Ronald L. HOLIFIELD, et al., Appellants.
v.
BancorpSOUTH, INC. d/b/a Bank of Mississippi, et al., Appellees.
No. 2002-CA-01590-COA.
Court of Appeals of Mississippi.
August 3, 2004.
Rehearing Denied October 26, 2004.
Certiorari Denied January 13, 2005.
*242 Kenneth A. Rutherford, attorney for appellants.
James Patrick Caldwell, Tupelo, attorney for appellees.
EN BANC.
SOUTHWICK, P.J., for the Court.
¶ 1. The Circuit Court of Jones County granted summary judgment to a bank that had been accused of not having properly monitored the financial activities of one of its customers. We agree that there are no genuine issues of material fact and affirm. Recent Supreme Court precedents make clear that since the bank had no actual knowledge of the customer's alleged frauds, it had no liability.
¶ 2. Ronald L. Holifield and approximately fifty other individuals and businesses filed suit against BancorpSouth and other defendants. We will collectively refer to the plaintiffs as "the investors." We will on occasion distinguish Holifield from the remaining plaintiffs. This appeal pertains solely to defendant BancorpSouth. The suit against other defendants continues in the circuit court.
¶ 3. James D. Harrell, IV, a defendant in the case, and Ronald Holifield had a business relation that began in 1995. Holifield assisted Harrell in obtaining a one hundred million dollar annuity contract, but that was canceled by the issuing insurance company, General American Life Insurance Co. A significant participant in that failed endeavor was a man named Douglas R. MacCachran, who described himself as a "management consultant."
¶ 4. A month after the cancellation of the annuity, MacCachran proposed in a lengthy faxed letter to Holifield that the latter assist in acquiring participants in a purported investment opportunity in Europe. MacCachran said that Harrell would be "a participant in this new transaction," but there must be "[a]bsolutely no `sharing of information' referencing any and all parties to the transaction, banks involved, insurance products, government contracts and the actual agreements, incoming and outgoing faxes including the cover sheet information and its originator(s)." Of some importance to later events, MacCachran also stated to Holifield that the "technical procedures involved in this transaction ... [and] virtually every single scrap of this transaction ... will not be made available to any individuals either internal or external."
¶ 5. Ronald Holifield agreed to promote this highly secret investment opportunity to some of his insurance clients and others, many of whom are now plaintiffs with him in this suit. There was no investment prospectus or other printed information. Indeed, MacCachran's agreement with Holifield was that information relating to virtually everything about the transactions was to be withheld from investors. The alleged plan entailed wiring money abroad with the promise to investors of high returns. Apparently the financial fortunes were to be gained through a practice called "forfaiting." Among its variations are those described in the following definition:
The practice of taking promissory notes or other obligations without recourse, usually in connection with the importation of goods. A foreign buyer may cause its bank to avalize its notes, so *243 that the seller of goods or services to whom the buyer gives the notes can forfait them with a domestic bank. The domestic bank will take the notes from the buyer without recourse because the notes are subject to the foreign bank's aval.
www.lettersofcreditonline.com/reports/archive/Glossary.htm
¶ 6. Another challenging word injected into that definition, "aval," is defined this way:
An independent guaranty used in civil law countries, often by banks and often with promissory notes or other commercial obligations. The aval may consist of the words "by aval" with the bank's signature.
Id. A federal court has described "forfaiting" transactions as "an inventive means of facilitating exports to troubled or debt-laden countries." A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 78 (2d Cir.1993). High risks apparently are supposed to equate to a potential for high returns.
¶ 7. Whatever prospective investors made of what would actually occur with forfaiting, many must have seen sufficient promise of substantial returns to sign up. Contributions of those who have joined as plaintiffs in this suit ranged in amounts from $12,000 to nearly $600,000. This money was entrusted to Harrell, who then sent the funds abroad. Exactly how the investment would generate the substantial return was poorly explained to anyone. According to a later federal indictment, there was in fact no investment opportunity for anyone except Harrell, MacCachran, and a third insider named Charles Scott Burris. Harrell placed the money in difficult-to-trace foreign accounts. He was charged with making payments to early investors entirely out of funds acquired from new investors, a process which in the parlance of fraud is known as a "Ponzi scheme." MacCachran, Harrell, and Burris were indicted in 1997 for fraud and conspiracy, among other crimes.
¶ 8. The defendant BancorpSouth was the bank that Harrell used for his transactions. Harrell had two accounts at BancorpSouth, which was then known as the Bank of Mississippi. One was a general checking account for the operating expenses for his law firm. The other was an account that he used for his attorney trust funds.
¶ 9. After discovery was completed, the bank filed a motion for summary judgment. The investors in seeking to fend off summary judgment relied solely on common law negligence principles. BancorpSouth was said to have been negligent by permitting Harrell to take large sums of money from these accounts and wire the funds to European destinations. The investors argue that, without the negligent actions of the bank, Harrell would not have been able to defraud them. The circuit court granted the bank's motion, dismissing it from the suit. The court also entered an order certifying that there was no reason for delay in entering a final judgment as to the bank. Ronald L. Holifield initially was the sole appellant from the judgment. The Supreme Court later determined that counsel for the other investor plaintiffs had committed excusable neglect in failing to make a timely appeal, and allowed all the investors to join in the appeal.

DISCUSSION

1. Legal overview
¶ 10. The plaintiffs in this case are individuals and businesses who placed large sums of money into the hands of James D. Harrell, IV. They did this with nothing more than a two page contract with Ronald Holifield for a European investment *244 program. The contracts stated that the funds the client would invest would be placed in Harrell's trust account and the investors would receive returns within 120 days. The account number for the trust account was also revealed in the contract. The funds were placed in Harrell's account at BancorpSouth. He then wired the funds to other banks in Europe as well as in the United States. The claim now made is that the bank should have been alerted to the doubtfulness of this activity and owed the investors a duty to halt it.
¶ 11. Various theories were presented in the case. At summary judgment, the sole legal claims that Holifield presented were based on common law negligence. BancorpSouth had based its motion for summary judgment on its alleged compliance with various statutory obligations regarding its procedures. The investors argued that the statutes relied upon by BancorpSouth were irrelevant to the "common law negligence issues which are the gravamen of Plaintiffs' complaint against the Bank." The bank allegedly had a duty to the plaintiffs that was breached and proximately caused their damages. The alleged duty owed was to act in a reasonably prudent commercial manner. That therefore is the theory relevant to our analysis. On summary judgment, a party may not rely on allegations in its pleadings. By affidavits and other evidence, the party defending against the motion must show that there is a dispute of fact that is material to an issue for resolution. M.R.C.P. 56(e). The investors made their stand solely on the question of common law negligence and that is what we review.
¶ 12. The investors argue that the bank owed a duty to them which was breached and proximately caused them damage. There are two principal sources for a definition of that alleged duty. One comes from precedents on the nature of commercially reasonable banking practices. The other is a banking concept called "Know Your Customer," the details of which will be explained below.
¶ 13. Before seeking to understand BancorpSouth's legal duties, we seek to understand its factual actions. Harrell's law office had its general operating account with BancorpSouth. In addition, the James D. Harrell, IV, Lawyer's Trust Account was also with this bank. Through this relationship, the bank allowed Harrell to deposit funds into these accounts. It also allowed Harrell to write checks drawing money from these accounts. The bank had a signature card to match Harrell's signatures on endorsements and withdrawals. One card was for the general account, the other was for the trust account. The signature was identical for each.
¶ 14. As the investors wrote their checks to James D. Harrell, IV, in Trust, Harrell would endorse them. Some of the checks were then deposited into his trust account with BancorpSouth as stated in the investors' agreement with Holifield. Other checks totaling about $1.9 million were deposited into his general business account. The checks were then honored by the various banks utilized by the investors. The account number of Harrell's general account was on the checks placed into that account. This was a different number than the one for the trust account stated on the contract between the investors and Holifield. None of the investors complained as to those checks.
¶ 15. The investors argue that the bank should not have allowed Harrell to make the deposits into his general account, since the payee on the checks was to Harrell "in trust." The argument is that unless Harrell was using a trust account, the bank should have refused to deposit checks made to a trustee. Some of the checks *245 were not endorsed, and that is also said to violate the bank's obligations. Some of the endorsements were just with Harrell's name, without a reference to his being a trustee.
¶ 16. The investors also complain that the deposits were generally made simply by a teller at the bank. No officer or other employee examined the checks before the deposits were allowed. There was evidence that on only one occasion was a deposit questioned. In that situation, a check had been made out to two individuals other than Harrell, in trust for certain beneficiaries. Harrell was called, satisfactorily explained the check, and the deposit was made.
¶ 17. There are other factual allegations that have been made. The significant ones will be discussed as we address the legal issues surrounding the identification of the bank's duty to the investors when depositing the checks that they wrote to Harrell.

2. Source and nature of bank's duty
¶ 18. The investors wish to address these issues of the bank's duty solely as a matter of common law negligence. In response to the summary motion, the investors stated that the bank owed them the duty to handle the deposits of their funds by Harrell in a non-negligent manner. Three precedents were the primary source of the investors' understanding of the law during summary judgment. We will discuss each.
¶ 19. In one, the investors state that a bank was found liable to someone who was not one of its customers for negligence in the handling of a deposit. First Nat'l Bank v. Langley, 314 So.2d 324 (Miss.1975). That case is factually quite different from today's appeal. An employee of a business with an account at the bank made a night deposit. The bag of cash and coins got hung up inside the night deposit box and was not discovered for weeks. In the meantime, the employee was suspected of having stolen the funds. After several unsuccessful searches were made, the manufacturer of the box sent an employee who dismantled the box and found the bag. The customer's employee sued the bank for his emotional and physical damages from the false suspicions. Id. at 327-28. The Supreme Court stated this rule: a "bank owed the agent of one of its customers the duty to receive and properly credit to the account of its customer funds entrusted to the agent, and for which he is liable." Id. at 329. The distinctions from this case are many, but an important one for our purposes is that the duty found in Langley was to an employee and agent of one of its account holders, not to the payor who made out a check to a bank customer.
¶ 20. A second precedent relied upon by the investors in the trial court concerned a bank that deposited checks with forged endorsements on them. Delta Chem. and Petroleum, Inc. v. Citizens Bank of Byhalia, Mississippi, 790 So.2d 862 (Miss.Ct.App.2001). In an important and able opinion written for this Court by the late Judge James Thomas, we discussed the duties of a bank when presented with checks that had forged endorsements. Two accounts were opened with names almost identical to those of two corporations, but in fact the accounts were unknown to the corporations. With the alleged assistance of a bank officer, checks intended for the two corporations were instead deposited into these accounts over which the corporations had no control and about which they had no knowledge. A specific section of the Uniform Commercial Code as adopted in Mississippi provides for liability for accepting checks on forged endorsements. Miss.Code Ann. § 75-3-419 (Rev.2002). We relied on the statute and caselaw that provides that the reimbursement *246 by the proper payee may be obtained from both a drawee and a collecting bank. Mississippi Bank & Trust Co. v. County Supplies & Diesel Serv., Inc., 253 So.2d 828, 830 (Miss.1971), cited in Delta Chemical, 790 So.2d at 869. That statute and the cited caselaw are not relevant to today's issues.
¶ 21. The final precedent urged as a basis to deny summary judgment was Great Southern National Bank v. Minter, 590 So.2d 129 (Miss.1991). The Court explained the case this way:
This case presents the question of whether a bank is liable where it accepts for deposit to an attorney's trust account, on the attorney's endorsement, checks made payable to an estate, in care of, or "c/o", the attorney where the attorney is in fact the conservator of the estate and where the attorney subsequently misappropriates proceeds from the account including the proceeds of the checks in question. We hold that, without more, the answer is no.
Id. at 130. Thus, Minter has some similarities with the present case. A fiduciary  in that case a conservator of an estate  placed checks made out to and intended for his ward into his own account. A distinction is that the only Minter account was a trust account. The commingling of funds from clients and others to whom the attorney owed fiduciary responsibilities such as a ward was found to be an acceptable practice. The bank was not on notice of possible misdirection of funds simply from conservatorship funds being placed in an attorney trust account. Id. at 133 n. 3. That was true even though some of the Minter checks were endorsed by the fiduciary individually without reference to his fiduciary capacity.
¶ 22. Summary judgment for the plaintiff was reversed, as the Supreme Court found that these facts did not constitute notice to the bank of fraud. However, the failure to grant summary judgment for the bank was affirmed. The question to be resolved before judgment for the bank could be entered is whether the bank had in any manner been put on notice that it needed to inquire about the conduct of the fiduciary. The Minter court stated that a bank would not be responsible for a trustee's breach of trust in the use of funds unless the bank had actual notice of the default:

If the trustee deposits trust funds in a bank, the bank is liable for participation in the breach of trust in receiving or in permitting the trustee to withdraw the trust funds, where the trustee commits a breach of trust in making the deposit or withdrawal, if, but only if, the bank received the deposit or permitted the withdrawal with notice of the breach of trust.

Id. at 134-35, quoting Restatement of Trusts § 324 (1935) (emphasis added in Minter). The court denied that the trustee's placing of conservator funds into his attorney trust account created the necessary notice. Id. at 135. Still, the court upheld the refusal to enter a summary judgment for the bank. The court was uncertain whether discovery had been completed, as the record was ambiguous on that point. What needed to be understood prior to judgment was "the nature of the withdrawals made by Drake from his trust account and, what, if any, knowledge the bank had regarding Drake's general conduct which might have put it on notice sufficiently to require action at some point which would have been of benefit to plaintiff." Id.
¶ 23. Though the trial judge's denial of summary judgment was affirmed in Minter, the Supreme Court did not hold that summary judgment had to be denied. Instead, the denial was within the "broad *247 discretion" of a trial court in considering whether to grant a motion for summary judgment. Id. at 136. In our appeal, summary judgment was granted. That too potentially could be sustained as within the broad discretion of a trial judge on summary judgment, but only if we conclude that the evidence before the trial court did not show a dispute of material fact about whether the bank had notice that Harrell was committing a breach of trust with the funds from these investors.
¶ 24. We return to a precedent that we have already discussed for a broader statement about determining reasonableness in the actions of a bank in accepting checks for deposit:
"Reasonableness," as it pertains to the transactions at issue, is defined as whether a reasonable person would be on notice that something is running afoul of what is commercially reasonable, whether from some impropriety appearing in the form of the instrument and the accompanying endorsements or from knowledge of extrinsic facts outside of the instrument itself.
Delta Chemical, 790 So.2d at 875. The investors at summary judgment rejected reliance on any statutes or regulations as sources of standards of reasonable conduct. There was reliance, though, on the "Know Your Customer" program implemented at BancorpSouth. According to the trial judge, that program grew out of regulations that were proposed by the Federal Deposit Insurance Corporation, but were then withdrawn and never implemented. The trial judge determined, though, that since the bank had voluntarily adopted certain policies that grew out of the FDIC proposals, "this court must consider whether the failure to follow the policy was a failure to follow commercially reasonable banking practices, and therefore negligent."
¶ 25. The policy was contained in a twenty-five page document that largely dealt with compliance with federal laws on large currency transactions. The trial judge determined that these were internal policies, which did not have the force of law, adopted by the bank to provide protection to itself and to its customers. The trial judge rejected that these policies created any duty to the public at large, including to those who may have written checks to customers of the banks. We have not been shown by the investors any authority to the contrary. We therefore do not consider the internal "Know Your Customer" policies in our review.
¶ 26. What we are left with examining, then, is whether there was a dispute of material fact concerning whether a commercially reasonable bank would have been on notice of Harrell's improprieties. To repeat, the investors alleged that many of the checks deposited to his account were not endorsed by him in his fiduciary capacity, and that about half of the total value of the checks was deposited not in Harrell's attorney trust account but in his general operating account.
¶ 27. On the issue of the endorsements, the trial judge relied on a statute that allegedly resolved the question. Though the investors reject the relevance of statutes to their common law negligence claims, we conclude as did the trial judge that a bank's operating consistently with its rights under, for example, the Uniform Commercial Code, would in most situations constitute commercially reasonable practices. One allegedly relevant statute provides that the identity of the person to whom an instrument is initially payable is determined by the intent of the person who issued the instrument. Miss.Code Ann. § 75-3-110(a) (Rev.2002). Additional clarification is made regarding trusts:

*248 (c) A person to whom an instrument is payable may be identified in any way, including by name, identifying number, office, or account number. For the purpose of determining the holder of an instrument, the following rules apply:
...
(2) If an instrument is payable to:
(i) A trust, an estate, or a person described as trustee or representative of a trust or estate, the instrument is payable to the trustee, the representative, or a successor of either, whether or not the beneficiary or estate is also named.
Miss.Code Ann. § 75-3-110 (Rev.2002).
¶ 28. Investors wrote checks, in various amounts, payable to James D. Harrell, IV, in Trust. According to the just-quoted statute, the checks are therefore payable to the trustee, James Harrell, even without clarity as to the beneficiary of the trust. Yet that is not really our issue. The individual named James Harrell was a proper person to be making decisions regarding the check, but it was Harrell as a trustee to whom the checks were payable. Section 75-3-110 is not clearly addressing whether the named trustee may place checks made out to him as a trustee into his own non-trust account. The official comments to the UCC made clear that the focus of this part of section 75-3-110 is on the identification of an ambiguous payee:
In the case of a check payable to "John Smith," since there are many people in the world named "John Smith" it is not possible to identify the payee of the check unless there is some further identification or the intention of the drawer is determined. Name alone is sufficient under subsection (a), but the intention of the drawer determines which John Smith is the person to whom the check is payable.
UCC 3-110, Official Comment (1991). The comments were not adopted by the Mississippi legislature nor do we discover a provision whereby the comments were made persuasive authority. Still, we look to official comments about uniform laws, when those laws have been adopted all but verbatim by the legislature, as the most informed source explaining provisions of the original enactment. Therefore, section 75-3-110 guides the identification of the entity to whom funds are to be paid. It does not address the obligations of the bank in determining what to do with a check or other negotiable instrument made out to a payee in trust.
¶ 29. Neither party spends much time examining Chapter 4 of the UCC regarding bank deposits, and thus we accept that they did not find the answers to the issues on review in that chapter. See Miss.Code Ann. §§ 75-4-101 through 75-4-504 (Rev.2002). Only two sections out of Chapter 4 are mentioned by the bank. The one that we find useful states that when a holder of a check as was Harrell delivers it to his bank, the bank became a holder in due course regardless of whether the holder endorsed the checks, so long as certain conditions were met. Miss.Code Ann. § 75-4-205(1) (Rev.2002). The conditions included that there not be an apparent forgery or alteration to the instrument, that it not be "so irregular or incomplete as to call into question its authenticity," and the bank took the check for value, in good faith, and without notice of various statutorily-defined defects in the instrument. Miss.Code Ann. § 75-3-302(a) (Rev.2002). This statute removes the issue of the varying endorsements on checks made out to Harrell as trustee. Sometimes Harrell did not endorse at all, sometimes he did so individually, and sometimes as a trustee. We find no authority that a trustee's endorsement is defective if *249 he does not refer in some manner to his fiduciary capacity. This was not a "forged" endorsement as the investors argue, as it was the same individual who had the authority to endorse, no matter whether he added language about his capacity.
¶ 30. As to the question of whether it was improper for Harrell to place checks made out to him as a trustee into his operating account, we find a more recent precedent than Minter to provide the answer. Collier v. Trustmark Nat'l Bank, 678 So.2d 693 (Miss.1996). In Collier, a trustee embezzled funds from the trust beneficiaries. Id. at 694. The beneficiaries filed suit against the bank claiming that it was negligent in allowing the trustee to remove funds from the trust account and place them in his own personal account. Id. The Supreme Court looked to statutory law and found that the trustee was allowed to place the funds in his own account and there was no duty by the bank to prevent him from doing so. Id. at 697. Only if the bank had actual knowledge of the trustee's fraudulent actions at the time of the transaction would there be a fact question to present before a jury. Id. Actual knowledge was defined as "awareness at the moment of the transaction that the fiduciary is defrauding the principal. It means express factual information that funds are being used for private purposes in violation of the fiduciary relationship." Id. at 697, quoting Master Chem. Corp. v. Inkrott, 55 Ohio St.3d 23, 563 N.E.2d 26, 30-31 (1990).
¶ 31. The statute from which Collier derived the actual knowledge requirement was this one:
The third person is not bound to inquire whether the trustee has power to act or is properly exercising the power; and a third person, without actual knowledge that the trustee is exceeding his powers or improperly exercising them, is fully protected in dealing with the trustee as if the trustee possessed and properly exercised the powers he purports to exercise. A third person is not bound to assure the proper application of trust assets paid or delivered to the trustee.
Miss.Code Ann. § 91-9-115 (Rev.1994). The bank cannot be liable to the investors if there was no actual knowledge of Harrell's wrongdoings. Harrell took funds from checks made payable to his trust account and sent them to banks in the United States as well as abroad. BancorpSouth had no duty to ensure that the funds of the trust account were properly being spent.
¶ 32. These statutes set forth that only with actual knowledge of improper behavior was the bank responsible for Harrell's actions. The investors argue that a bank officer thought that the investment arrangement Harrell was conducting was "too good to be true." Harrell transferred money from his trust account to his business account and then wired some of the money overseas. Harrell's law practice changed from title opinions and collection work to "representing people who were doing investments." Substantially more money flowed into and out of the account with Harrell's new business focus. Each of these alleged indicia of suspicious conduct is also an example of Harrell's doing exactly what the investors wanted him to do. Nothing in the activities alleged was inconsistent with the investment plan that in cursory fashion was explained to these plaintiffs.
¶ 33. The investors knowingly gave Harrell several million dollars. They did not do this with the intention to place the funds in his trust account and for them to remain there. They expected him to wire their money abroad. They were not concerned when they received checks that Harrell had cashed and placed in an account *250 other than the one stated on the contract. The investors, now appellants, were the voluntary source of the money. If the bank had conducted an investigation, it would have found that this behavior of depositing funds to later transfer them to other banks was with the investors permission and approval.
¶ 34. There were no disputes of material fact sufficient to require that this case go to a jury. There were only disputes of interpretation of law, for which no trial was needed. We affirm.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS ARE ASSESSED TO THE APPELLANTS.
KING, C.J., BRIDGES, P.J., LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.